PEOPLE v REID

Docket No. 190302. Submitted November 4, 1998, at Grand Rapids.
Decided January 19, 1999, at 9:15 A.M. Leave to appeal sought.

John P. Reid was convicted by a jury in the Calhoun Circuit Court,
Allen L. Garbrecht, J., of two counts of first-degree criminal sexual
conduct (CSC I). The convictions arose out of two alleged acts of
fellatio involving a fifteen-year-old boy. The complainant was hav-
ing behavior problems at school, and the defendant was meeting
with the complainant with the permission of the complainant's par-
ents as a result of the defendant's assertions that he had experi-
ence counseling troubled youths. The alleged criminal acts took
place at the defendant's place of residence, a portion of the home
of defendant's parents that was occupied by the defendant and his
wife. During a search of the defendant's residence, the police found
soiled Kleenex tissues that tested positive for seminal fluid and
contained material that was consistent with having been emitted by
a person with the complainant's blood type and secretor status.
The prosecution, on cross examination of the defendant's wife after
she had testified that she had been sexually active with the defend-
ant shortly before the alleged incidents and that the Kleenex tis-
sues could have been used in connection with those activities,
inquired concerning the wife's refusal to submit to a blood test and
her knowledge of her blood type and secretor status. In charging
the jury with respect to the count of CSC I involving the alleged act
of fellatio committed by the defendant on the complainant, the
court instructed the jury that the prosecution had to prove beyond
a reasonable doubt  "that the Defendant engaged in a sexual act
that involved . . . the touching of [the complainant's] genital organs
with the Defendant's mouth or tongue." The defendant appealed.

The Court of Appeals *held*:

1. The defendant was convicted of CSC I under the provisions of
MCL 750.520(1)(b)(iii); MSA 28.788(2)(1)(b)(iii), which defines CSC I
as sexual penetration with another person who is at least thirteen,
but less than sixteen, years old by a defendant who is in a position
of authority over the victim and used that authority to coerce the
victim to submit. The jury could properly find that the complain-
ant's parents had placed the defendant in a position of authority
over the complainant during those times that they allowed the

complainant to spend time with the defendant outside their presence and that the complainant was aware that the defendant had been placed in that position of authority. The proofs showed that the defendant used his position of trust to secure permission to take the complainant to his place of residence, where he used his position of authority to induce the complainant to drink beverages spiked with alcohol and then, while the complainant was intoxicated, induced the complainant to engage in fellatio. The jury could properly find on these facts that the defendant had used his position of authority to cause the complainant to be constrained by subjugation to do what in the exercise of his free will he would have refused to do and could thus properly find that the defendant has used his position of authority to coerce the complainant to submit to the prohibited acts.

2. The Supreme Court's summary reversal by order of a conviction "because there was no evidence that the defendant used a position of authority to coerce the 14-year-old complainant to submit to sexual contact" does not provide a basis to consider the facts recited by the Court of Appeals in its affirmance of the conviction in an unpublished opinion to be binding precedent, because under such circumstances there is no assurance that the facts stated in the unpublished opinion of the Court of Appeals accurately reflect the facts in the record.

3. The prosecution's request that the trial court order the defendant's wife to submit to a blood test, a request that was made outside the presence of the jury and on which the court never ruled, did not deny the defendant a fair trial or constitute an act of prosecutorial misconduct.

4. The prosecution properly cross-examined the defendant's wife with respect to her refusal to submit to a blood test in response to defense questioning that suggested that the secreted material found on the soiled tissues found at the scene of the alleged crime might have come from the wife. The wife's testimony in this regard was not elicited for the purpose of establishing the defendant's guilt, but rather was proper cross-examination aimed at the credibility of the wife's testimony suggesting a possible source of the secreted material other than the complainant. For the same reason, the prosecution properly commented during closing arguments concerning the wife's refusal to submit to a blood test.

5. The trial court erred in instructing the jury that it could find CSC I "if the Defendant engaged in a sexual act that involved . . . the touching of [the complainant's] genital organs with the Defendant's mouth or tongue," because an act of fellatio for the purpose of satisfying the sexual penetration element of CSC I requires entry of the

penis into the mouth of another. However, the error was harmless beyond a reasonable doubt, because there was no evidence to support a conclusion that the defendant engaged in oral contact with the complainant's genitals without actually committing fellatio.

6. The question whether the prosecution improperly elicited testimony that the defendant exercised his constitutional right to remain silent was not preserved at trial and need not be considered on appeal because it is unlikely that the error affected the outcome of the trial.

7. Even if the prosecution's remark during closing arguments concerning the failure of the defendant to present proofs concerning a collateral issue did implicate the defendant's constitutional right against self-incrimination, any possible error does not require reversal of the defendant's conviction because the error was harmless beyond a reasonable doubt.

Affirmed.

RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — COERCION.

Coercion, as an element of first-degree criminal sexual conduct, may be actual, direct, or positive, as where physical force is used to compel an act against one's will, or implied, legal, or constructive, as where one party is constrained by subjugation to another to do what free will would refuse.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Susan K. Mladenoff,* Prosecuting Attorney, and *James B. Jenkins,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *C. Joseph Booker*), for the defendant on appeal.

Before: WHITBECK, P.J., and CAVANAGH and NEFF, JJ.

WHITBECK, P.J. A jury convicted defendant of two counts of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(b)(iii); MSA 28.788(2)(1)(b)(iii), but acquitted him of a third CSC I count. The trial court sentenced defendant to ten to twenty-five years' imprisonment on each of his two convictions. We affirm. The convictions are based on charges that,

while the then apparently fifteen-year-old complainant stayed the night of December 22-23, 1993,[1] at the home of defendant's parents, defendant performed fellatio on the complainant and had the complainant perform fellatio on him.[2]

## I. BASIC FACTS

The complainant's father, who was a part-time reserve police officer, indicated that he knew defendant, who worked for an ambulance company, through interaction related to their respective work. The complainant's father testified that the complainant was having some problems in school and that he started to talk about these problems with defendant at some point before December 1993. Eventually, defendant offered to help by talking with the complainant:

> [Defendant] said if you ever need someone to let him talk to or you know, someone that he can talk to that's willing to help, that he used to be a counselor at church and dealt with the kids and he would be willing to talk to him.

> \* \* \*

> [Defendant] kind of chuckled and said I can relate to [the complainant] because I was just like him when I grew up. He goes, I had a problem—he had problems when he was growing up. He didn't go into explanations, but he said he

---

[1] The complainant testified that his birthdate was October 8, 1978, which would have made him fifteen years old on the night of the incident. However, the complainant referred to himself as being age fourteen on the night of the incident at another point in his testimony. In any event, it is unimportant to the issues on appeal whether the complainant was fourteen or fifteen years old on the night of the incident. The portion of the CSC I statute underlying defendant's convictions, MCL 750.520b(1)(b); MSA 28.788(2)(1)(b), is applicable to certain acts of sexual penetration with a victim who "is at least 13 but less than 16 years of age."

[2] The count of which defendant was acquitted alleged that defendant anally penetrated the complainant.

had problems when he was growing up, but he can relate to
the kids and he seems to do really good with the kids, get a
rapport going or whatever.

The complainant's father said that a few months
thereafter, at some point several months before
December of 1993, he availed himself of defendant's
offered assistance and that the complainant spent
time with defendant on three or four occasions
including the night of the alleged incidents "[f]or the
purpose of [defendant] talking to [the complainant]
. . . [o]r like being counseled or whatever you want
to call it." The complainant's mother testified simi-
larly that the complainant was seeing the defendant
for "[a] type of informal counseling that [defendant]
had offered to work with [the complainant] and try
and find out what his problem was, why he wasn't
being real cooperative." The complainant's mother
also testified that defendant told her that he had done
some counseling before through his church and "that
he had been able to work with some of the other kids
that he had talked to and help them out a bit."

According to the complainant's testimony, he met
defendant through the complainant's father and prob-
ably spent time alone with defendant about four
times over a two-month period. The first time, which
was while the complainant was suspended from
school, they went to a mall and a Taco Bell restau-
rant. The complainant talked with defendant about
why he had been suspended from school and gener-
ally about what was going on in his life. The com-
plainant explained that, when defendant picked him
up, defendant told both the complainant and the com-
plainant's father that "he [defendant] had counseled
kids before, he was a counselor, I think, at his

church." When asked why he thought he was with defendant, the complainant replied, "just because my dad didn't really want to leave me alone to sit there and watch TV because I was suspended, so he offered to take me for the day so I wouldn't be at home and have free run of the house." The complainant testified that during the second and third times he visited defendant, they went to defendant's residence in Hastings, but that they did not talk very much about what was going on in the complainant's life.

The complainant testified that, on December 22, 1993, he stayed with defendant at the house of defendant's parents. The complainant stated that defendant called him and asked him if he wanted to stay with him that night, told him that they "could stay up like all night playing the computer and games that he got," and mentioned that his wife would not be there. The complainant's mother testified that the complainant called her at work in the early evening of December 22, 1993, and asked if he could leave their house with defendant. However, the complainant was still home when the complainant's mother arrived home that evening. She testified that defendant arrived at about 9:00 P.M. and that she was concerned about the lateness of the hour at which defendant and the complainant were departing and about the approximate thirty-mile distance to defendant's residence. She said that "they decided if it got late that [the complainant] would just sleep on the couch there and he would come home the following morning."

The complainant testified that, on the way to the house of defendant's parents, defendant stopped at a gas station and asked him if he wanted a pack of cigarettes and that defendant then bought him a pack of

"Marlboro reds" cigarettes. The complainant explained that defendant knew from their prior contact that the complainant smoked. Thereafter, they arrived at the house. Eventually, the complainant and defendant went downstairs to the basement where a computer and a bed were located. The two played with the computer for hours. At some point, after the complainant asked for something to drink, defendant went upstairs and apparently got some "7 Up" soda pop. Defendant gave the complainant a plastic glass that appeared to contain "7 Up." The beverage "tasted funny" to the complainant. However, he had not had "7 Up" for a long time and continued to drink it without any comment. After the complainant finished the first glass, he accepted defendant's offer of more glasses; the complainant thought that he probably had three or four glasses total, all of which had the same taste, in a period of about an hour to an hour and one-half.

After finishing either his first or second glass, the complainant saw defendant pour into the complainant's glass of soda pop a clear liquid from a tall bottle that had the word "vodka." At that point, the complainant described himself as feeling "[d]izzy, lightheaded." Eventually, the complainant asked defendant what he had been pouring in the complainant's drinks, and defendant said, "oh, it's just some vodka." As time went on, the complainant felt "[d]izzy, hot, sweaty, light-headed." When asked if he knew what was going on around him, the complainant replied, "[n]ot very well, everything kind of looked like it was in slow motion."

The complainant indicated that, during the time they were in the basement, defendant instructed him

to urinate in a two-liter bottle because he did not want the complainant to go upstairs and wake up his parents. The complainant thought that he urinated in the bottle twice.

According to the complainant, defendant eventually told him that he was drunk and that he should take off his shirt and pants so that if he got sick he would not get them dirty and his mother would not know. When the complainant stood up, he felt "really dizzy and off balance a lot." The complaint removed his shirt and pants and lay on the bed; he was still wearing his underwear. Defendant brought up pictures on the computer of males holding their genitals. Eventually, defendant got on the bed with the complainant.[3]

The complainant indicated that while he was lying on the bed, defendant eventually rubbed the complainant's genitals through his underwear. The complainant described himself as feeling "[n]umb" at that point. Defendant eventually reached under the complainant's underwear, rubbed the complainant's genitals, and told the complainant to take his underwear off. The complainant rolled over on his side, and defendant removed the complainant's underwear and then all of his own clothes. Defendant then resumed fondling the complainant and told the complainant to fondle defendant, which the complainant did.

The complainant's testimony regarding time frames is somewhat confused. However, he indicated that at some point defendant went to tend to his baby, but then returned. According to the complainant, defend-

---

[3] Following this point, complainant's testimony is, of necessity, quite graphic. While we regret having to include this testimony at any length, we reluctantly do so because it is central to the charges against defendant.

ant eventually started to perform oral sex on him. The complainant testified that, at some point thereafter, defendant asked the complainant to perform oral sex on defendant and that he did so. The complainant described himself as feeling dizzy and light-headed while he performed oral sex on defendant.

Eventually, the complainant reported to his mother that defendant had sexually abused him, and this triggered a series of events that quite rapidly led to police involvement and investigation. The police searched the basement of the house where the complainant said he had been sexually abused. A police officer testified that he seized soiled "Kleenex tissues" that appeared to have a tacky "yellowish substance" on them. Detective David Walters testified that he found a twelve- or sixteen-ounce bottle that may have contained urine. Testimony from a state police laboratory analyst indicated that some of these tissues contained material that was consistent with having been emitted from a person with a B blood type, which was the complainant's blood type (and apparently also the blood type of defendant's wife), and that some of the tissues tested positive for the presence of seminal fluid.

Defendant did not testify at trial. However, defendant's wife testified on direct examination by defense counsel that she and defendant were living in the house of defendant's parents from August of 1993 until the time of the alleged incidents in December of 1993 and that their room was in the basement. Defendant's wife said that she and defendant were sexually active and responded affirmatively to defense counsel's questions regarding whether they had had sex "recently" before the alleged incidents on

the bed in the basement. She indicated that Kleenex "[c]ould have been" used in connection with this activity.

## II. STANDARDS OF REVIEW

In reviewing whether the evidence was sufficient to sustain defendant's convictions, which we do in § III of this opinion, we view the evidence in the light most favorable to the prosecution to determine whether a rational factfinder could have found the essential elements of the crime proved beyond a reasonable doubt. *People v Medlyn*, 215 Mich App 338, 340; 544 NW2d 759 (1996).

In considering the allegations of prosecutorial misconduct, which we do in § IV and § VI, we consider the alleged misconduct in context to determine whether it denied defendant a fair and impartial trial. *People v Paquette*, 214 Mich App 336, 342; 543 NW2d 342 (1995). However, with regard to defendant's unpreserved allegations of prosecutorial misconduct, review is foreclosed unless no curative instruction could have removed any undue prejudice to defendant or manifest injustice would result from failure to review the alleged misconduct. *Id.* at 341-342.

In reviewing defendant's claim of an erroneous jury instruction, which we do in § V, we review de novo. *People v Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996).

## III. SUFFICIENCY OF THE EVIDENCE

Defendant was convicted of two counts of CSC I under the following statutory provision:

A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with

another person and if any of the following circumstances exists:

\* \* \*

(b) That other person is at least 13 but less than 16 years of age and any of the following:

\* \* \*

(iii) The actor is in a position of authority over the victim and used this authority to coerce the victim to submit.

Thus, conviction of CSC I under this provision requires proof of four elements: (1) the defendant sexually penetrated another person (the complainant), at a time when (2) the complainant was at least thirteen, but less than sixteen, years old, (3) the defendant was in a position of authority over the complainant, and (4) the defendant used this authority to coerce the complainant to submit to the sexual penetration. Defendant argues that there was insufficient evidence to support his CSC I convictions on the ground that the evidence did not support a conclusion that he used a position of authority to coerce the complainant to submit.[4] We disagree.

As an initial matter, there was sufficient evidence to conclude that defendant was in a position of authority over the complainant at the time of the incidents. The complainant's father testified that defendant told him that defendant had been a counselor at a church and would be willing to talk with the complainant about the complainant's problems. Both of

---

[4] Thus, the sufficiency of the evidence to support the first two elements, related to the occurrence of sexual penetration and the complainant's age, is not at issue. In any event, there was plainly sufficient evidence to support the jury's finding of those two elements.

the complainant's parents expressed an understanding that the complainant was spending time with defendant for defendant to counsel him. Also, according to the complainant's testimony, defendant stated to the complainant, in front of the complainant's father, that he was a counselor.

From the foregoing, a rational jury could infer, beyond a reasonable doubt, that the complainant's parents placed defendant in a position of authority over the complainant, particularly at times when they allowed the complainant to spend time with defendant outside their presence, and that the complainant was aware of this. Indeed, on the occasion of the first meeting between the complainant and defendant, the complainant's father delivered the complainant into defendant's care on a day that the complainant was suspended from school. Further, the testimony of the complainant's mother indicated that she entrusted the complainant to defendant's care on the night of the alleged incidents. Thus, a reasonable factfinder could determine beyond a reasonable doubt from this evidence, viewed in a light most favorable to the prosecution, that before *and continuing at the time of the charged incidents*, defendant was acting in a position of authority over the complainant.

Next, we must examine whether there was sufficient evidence to support a finding that defendant used that position of authority to coerce the complainant to submit to the charged acts of sexual penetration underlying his convictions. It is important to bear in mind that, "[f]orce or coercion is not limited to physical violence but is instead determined in light of all the circumstances." *People v Brown*, 197 Mich App 448, 450; 495 NW2d 812 (1992).

While not exactly on point because they did not expressly involve an allegation of use of a position of authority to coerce a victim to submit, two previous opinions from this Court regarding what constitutes coercion are highly instructive: *People v Regts*, 219 Mich App 294; 555 NW2d 896 (1996), and *People v Premo*, 213 Mich App 406; 540 NW2d 715 (1995). In *Premo*, at 410-411, quoting Black's Law Dictionary (5th ed), 234, the panel stated that coercion " 'may be actual, direct, or positive, as where physical force is used to compel act against one's will, *or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse.*' " (Emphasis supplied.) In *Regts, supra* at 295-296, this Court, noting the discussion of "implied, legal or constructive" coercion[5] in *Premo*, stated:

> In the case at bar, defendant, as the victim's psychotherapist, manipulated therapy sessions to establish a relationship that would permit his sexual advances to be accepted

---

[5] We note that the recognition in *Regts* and *Premo* that coercion for purposes of CSC cases extends to situations that do not involve the accomplishment of sexual contact or sexual penetration by raw physical force or threats of physical violence is consistent with the statutory language of MCL 750.520b(1)(f); MSA 28.788(1)(f), which provides in part:

> Force or coercion includes *but is not limited to* any of the following circumstances:

> *       *       *

> (iv) When the actor engages in the medical treatment or examination of the victim in a manner or for purposes which are medically recognized as unethical or unacceptable. [Emphasis supplied].

In expressly including such unethical conduct by medical personnel as an example of force or coercion, the CSC I statute reflects that coercion for purposes of that statute extends far beyond the direct use of raw physical force or threats of physical violence.

without protest. That is, he subjugated the victim into submitting to his sexual advances against her free will. Accordingly, the circuit court properly reinstated charges with respect to all "coercion" theories.

Viewing the evidence in the light most favorable to the prosecution, defendant placed himself, with regard to the complainant, in a role highly analogous for present purposes to that of a psychotherapist with a patient. Defendant indicated to the complainant's father and the complainant that he had acted in a counseling role at a church and talked with the complainant about problems that he was having. Having established a position of trust with the complainant's parents, defendant invited the complainant to spend the night at the house of defendant's parents. Indeed, the complainant's testimony that defendant asked him to come over to play on a computer could reasonably have been taken by the complainant and his parents as part of an effort by defendant as an unofficial "counselor" to continue developing a rapport with the complainant. A reasonable jury could infer from this evidence that defendant manipulated his "counseling" role with the complainant—"a position of authority"—in order to have the complainant alone where defendant could sexually assault him.

According to the complainant, on the night of the incidents, defendant, while acting in this position of authority over the complainant, gave the complainant beverages that he "spiked" with alcohol and had the complainant consume these beverages to the point of becoming heavily intoxicated. A reasonable jury could infer that this was done with the intent to reduce the complainant's inclination or ability to resist engaging in sexual activity with defendant. The

complainant's testimony strongly reflects that he was disoriented at the time of the acts of fellatio and that he was, in large part, mechanically following the commands of defendant with regard to his actions or lack of resistance. He described himself as feeling as if he were in a "bad dream" during the encounter. Viewing the evidence most favorably to the prosecution in light of all the circumstances, *Medlyn, supra,* defendant used a position of authority over the complainant to engineer a quite elaborate series of events to place the complainant in a confused and disoriented condition and then took advantage of the complainant's condition to perform fellatio on the complainant and to instruct successfully the complainant to perform fellatio on him. This is sufficient evidence for a rational factfinder to conclude that the complainant was "constrained by subjugation," *Premo, supra* at 411, and, thus, coerced into submitting to these acts of sexual penetration by defendant through use of his position of authority over the complainant.

Moreover, in *Premo, supra* at 407, the defendant was convicted of three counts of fourth-degree criminal sexual conduct (CSC IV)[6] based on charges that, while a teacher at a high school, he pinched three female students on their buttocks on the premises of the high school. This Court held that this conduct involved coercion:

---

[6] *Regts* and *Premo* each involved fourth-degree criminal sexual conduct (CSC IV) convictions. *Regts, supra* at 295; *Premo, supra* at 407. However, the meaning of "coercion" under the CSC I statute, MCL 750.520b; MSA 28.788(2), is identical to the meaning of "coercion" under the CSC IV statute, MCL 750.520e; MSA 28.788(5), because the latter statute describes "coercion" by reference to the former. MCL 750.520e(1)(a); MSA 28.788(5)(1)(a). Thus, the discussion of conduct that constitutes coercion in *Regts* and *Premo* is just as controlling in this CSC I case as it would be in a CSC IV case.

We believe that defendant's actions constituted implied, legal, or constructive coercion because, as a teacher, defendant was in a position of authority over the student victims and the incidents occurred on school property. Defendant's conduct was unprofessional, irresponsible, and an abuse of his authority as a teacher. Accordingly, we conclude that defendant's conduct in this case is sufficient to constitute coercion under MCL 750.520e(1)(a); MSA 28.788(5)(1)(a). [*Id.* at 411.]

In this regard, a common feature of the situation with the teacher in *Premo* and the psychotherapist in *Regts* is that the victims were in a position of special vulnerability with respect to the defendants. Similarly, in this case, a reasonable jury could have found that defendant exploited the special vulnerability attendant to his relationship with the complainant to abuse him sexually. While it is true that defendant in this case did not hold a formal position, such as being a school teacher, we find that inconclusive. There certainly was sufficient evidence to support a finding that defendant was placed in a substantially similar position of practical authority over the complainant. The defendant teacher in *Premo* occupied a position in which he was generally charged with control and supervision of students at his high school. Here, there was evidence that the complainant's parents had entrusted the complainant to defendant's care. Further, viewing the evidence in a light most favorable to the prosecution, the complainant was alone with defendant at a location where the complainant was isolated from others and subject to the general control of defendant. These circumstances further support our conclusion that there was sufficient evidence that defendant used a position of authority to coerce the complainant to participate in two acts of fellatio.

Defendant, however, relies in substantial part on the Michigan Supreme Court's summary decision in *People v Usman*, 428 Mich 902 (1987), in which the Court reversed the defendant's conviction of second-degree criminal sexual conduct "because there was no evidence that the defendant used a position of authority to coerce the 14-year-old complainant to submit to sexual contact." In our view, the brief summary discussion in *Usman* does not include factual background concerning the allegations in that case and, thus, does not explain *why* the evidence in that case was insufficient to support a finding that the defendant used a position of authority to coerce submission to sexual contact.

Defendant would have us give meaning to the Supreme Court's order in *Usman* by drawing the pertinent facts of that case from the unpublished opinion of this Court that was being appealed to the Supreme Court. *People v Usman*, unpublished opinion per curiam of the Court of Appeals, decided September 11, 1986 (Docket No. 81096). However, while we respect and commend appellate defense counsel's diligence and zealous advocacy in researching and presenting the unpublished opinion underlying the Supreme Court's summary decision in *Usman*, we conclude and hold that nothing in that unpublished opinion should be considered in determining what is binding precedent under our Supreme Court's decision in *Usman*, for two separate reasons.

First, by its result, the Supreme Court in *Usman* disapproved the holding of this Court on the fact-intensive issue of the sufficiency of the evidence. Against that background, we conclude that none of the factual discussion in this Court's unpublished

opinion should be accepted as accurate, because it is reasonably conceivable that an error in some part of the factual discussion of the unpublished opinion was the basis for its reversal. Second, MCR 7.215(C)(1) expressly provides that an unpublished opinion of this Court "is not precedentially binding under the rule of stare decisis." Thus, absent the Supreme Court expressly adopting all or part of an unpublished opinion of this Court, it would be inappropriate to consider any part of such an unpublished opinion as substantively binding in an unrelated case.

In sum, we hold there was sufficient evidence to support defendant's convictions.

### IV. ALLEGED PROSECUTORIAL MISCONDUCT RELATED TO DEFENDANT'S WIFE

#### A. REQUEST FOR A BLOOD TEST

Defendant claims that the prosecutor committed misconduct by requesting the trial court to order defendant's wife to undergo a blood test. We disagree. On the first day of trial, outside the presence of the jury, the prosecutor requested the trial court to issue an order requiring the taking of a blood sample from defendant's wife. The trial court took the request under advisement and apparently never actually ruled with respect to the request. Whether the events are properly characterized as an implicit denial of the request or an abandonment of the request by the prosecution, the end result was that no such blood test was ordered by the trial court. At trial, the testimony of a state police laboratory analyst indicated that some tissues seized from the basement included material from someone with a B blood type. There was also evidence that the complainant had a B blood

type, and the complainant testified that he was not sure if he ejaculated during the encounter with defendant. Evidently, the prosecutor desired a blood test of defendant's wife to ascertain, if possible, whether any of the fluids on the tissues emanated from her. Regardless of how the trial court should have ultimately ruled with respect to this matter if it had been pursued further, we see no improper prosecutorial conduct by simply making this nonfrivolous request outside the jury's presence. Thus, the prosecutor's request for blood testing of defendant's wife did not deny defendant a fair trial. *Paquette, supra* at 342.

### B. PROSECUTORIAL CROSS-EXAMINATION OF DEFENDANT'S WIFE

Defendant also argues that the prosecutor improperly questioned defendant's wife regarding her resistance to taking a blood test. We again disagree. On direct examination by defense counsel, defendant's wife testified, in essence, that she and defendant engaged in sexual activity in the basement shortly before the time that the complainant asserted that he was sexually assaulted by defendant and that Kleenex could have been used in connection with this. In short, defense counsel elicited this testimony as evidence that the soiled tissues found by the police in the basement (and determined by the state police analyst to include the presence of seminal fluid) may have resulted from such marital sexual activity, thereby reducing the value of the evidence of the tissues as corroborating evidence to support the complainant's version of events.

Thereafter, the following exchange occurred at the beginning of the cross-examination of defendant's wife by the prosecutor:

*Q.* Mrs. Reid, the last question [defense counsel] asked you, you indicated that you're a type B blood; is that correct?

*A.* Yes, it is.

*Q.* Do you know whether you're a secretor or nonsecretor?

*A.* I don't know.

*Q.* In fact, I asked at the beginning for a sample of your blood.

[*Defense counsel*]: I object to that, Judge, that's improper.

[*The prosecutor*]: I'm asking if she was aware.

[*Defense counsel*]: He never asked this witness.

[*The prosecutor*]: Well, I didn't ask that question. I'm asking her if she's aware I've asked for a sample of her blood to be tested.

*The Court*: She can respond.

*The Witness*: Yes, I'm aware of it.

*Q. And, in fact, you were also aware that the defense has objected to that?*

*A. On my request, yes.*

*Q.* You heard the testimony that there was blood found on the tissues next to the bed?

*A.* Yes.

*Q.* And you also heard that your husband is a nonsecretor?

*A.* Yes.

*Q.* Do you know where that came from?

*A.* The information?

*Q.* No, the blood.

*A.* I don't know.

*Q. You understand that it wouldn't come from your husband?*

*A. Yes, I do.*

*Q. You still object to having your blood tested so the jury can hear the results?*

*A. Yeah, I feel I should have been asked for it to begin with.*

Q. So you are objecting?

A. Yes.

Q. Do you know your PGM sub-type?

A. No, I don't. I've been blood typed, I've received transfusions.

Q. But you don't know your PGM?

A. I don't know, no. [Emphasis supplied.]

We reject defendant's claim that the prosecutorial cross-examination at issue was improper. While the prosecution may not use a defendant's failure to present evidence as substantive evidence of guilt, the prosecution is entitled to contest fairly evidence presented by a defendant. *Cf. People v Fields*, 450 Mich 94, 110-111; 538 NW2d 356 (1995). Further, a witness is subject to cross-examination concerning any issue in a case, including credibility. MRE 611(b). The conduct of defendant's wife in resisting participation in a blood test was highly probative of her credibility. Her testimony regarding the sexual activity with defendant suggested that this sexual activity may have been the source of the soiled tissues found by the police in the basement. If defendant's wife was being forthcoming in this regard, one could reasonably believe that she would have been eager to provide a blood sample that might corroborate her testimony by providing a genetic or blood-typing match between herself and the body fluids on some of the tissues seized by the police. Conversely, the prosecutor's eliciting of testimony on cross-examination indicating that she opposed submitting to a blood test could reasonably be viewed as strongly undermining the credi-

bility of her version of events. In this regard, " '[I]t is not error to comment on the failure of the defense to produce evidence on a phase of the defense upon which the defendant seeks to rely.' " *Fields, supra* at 111, n 21, quoting *United States v Bright*, 630 F2d 804, 825 (CA 5, 1980). Accordingly, we conclude that the questioning at issue did not improperly shift the burden of proof, but rather was proper because it directly challenged the credibility of testimonial evidence elicited by the defense in support of its theory of the case.

### C. PROSECUTORIAL CLOSING ARGUMENT

Defendant argues that the prosecutor improperly shifted the burden of proof during rebuttal argument by referring to the absence of a blood sample from defendant's wife. This issue was not preserved below, but, even if it had been, we would find the argument at issue to have been proper. The remark at issue was made in connection with the issue whether the soiled tissues in the basement were related to sexual activity between defendant and defendant's wife. However, as stated by the Supreme Court in *Fields, supra* at 115:

> [W]here a defendant . . . advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant. Although a defendant has no burden to produce any evidence, once the defendant advances evidence or a theory, argument on the inferences created does not shift the burden of proof.

Also, a prosecutor may argue from the evidence that a witness is unworthy of belief. *People v Howard*, 226

Mich App 528, 548; 575 NW2d 16 (1997). Thus, the prosecutor properly responded to the defense presentation of testimony from defendant's wife in relation to the soiled tissues by questioning her credibility in light of her resistance to providing a blood sample.

### V. JURY INSTRUCTION

Defendant argues that the trial court's instruction to the jury regarding the CSC I count alleging that defendant performed fellatio on the complainant improperly allowed conviction of that charge without a finding of penetration. While we agree that the instruction at issue was erroneous and this issue was preserved below, it does not constitute error requiring reversal because the error was harmless beyond a reasonable doubt.

The trial court instructed the jury with regard to the pertinent CSC I count that the prosecution had to prove, in part, beyond a reasonable doubt "that the Defendant engaged in a sexual act that involved . . . the touching of [the complainant's] genital organs with the Defendant's mouth or tongue."

"Sexual penetration" is an essential element of any charge of CSC I. MCL 750.520b(1); MSA 28.788(2)(1). Sexual penetration is statutorily defined for purposes of CSC I (and CSC III) in MCL 750.520a(l); MSA 28.788(1)(l) as

> sexual intercourse, cunnilingus, *fellatio*, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required. [Emphasis supplied.]

The instruction at issue was erroneous in indicating that a mere touching of the complainant's male genital organs by defendant's mouth or tongue would be "fellatio" that, together with other elements, would constitute CSC I. Rather, in *People v Johnson*, 432 Mich 931 (1989), the Michigan Supreme Court in considering an appeal from a decision of this Court summarily adopted Judge MICHAEL KELLY's dissenting opinion in *People v Johnson*, 164 Mich App 634, 646-649; 418 NW2d 117 (1987), in which Judge KELLY concluded that, at least for purposes of the CSC I statute, "fellatio" does *not* consist merely of "any oral contact with the male genitals," but rather requires entry of a penis into another person's mouth.

However, assuming that this error is of constitutional magnitude, it does not entitle defendant to relief because it was harmless beyond a reasonable doubt. *People v Graves*, 458 Mich 476, 482; 581 NW2d 229 (1998); *People v Anderson (After Remand)*, 446 Mich 392, 404-406; 521 NW2d 538 (1994) ("nonstructural" constitutional error that occurs during the presentation of a case to the jury does not require reversal if the reviewing court is satisfied the error was harmless beyond a reasonable doubt). The complainant testified that his penis entered defendant's mouth, while the defense theory was that defendant did not engage in any sexual abuse of the complainant whatsoever. There was no evidence presented at trial that would reasonably support a conclusion that defendant engaged in oral contact with the complainant's genitals without actually committing fellatio. Thus, the trial court's erroneous instruction regarding the type of physical conduct necessary to establish the CSC I count at issue was harmless beyond a reasona-

ble doubt. See *People v Yarger*, 193 Mich App 532, 534-535, n 1; 485 NW2d 119 (1992) (erroneous reference to "touching" with regard to an analogous charge held harmless given the nature of the allegation and the defendant's denial of any type of penetration).

## VI. OTHER ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

### A. QUESTIONING ABOUT DEFENDANT'S INVOCATION OF *MIRANDA* RIGHTS

Defendant argues that the prosecution improperly elicited testimony at trial from Detective David Walters that defendant invoked his *Miranda*[7] rights. This issue was not preserved below. We decline to reach this unpreserved issue, which we consider unimportant because it is unlikely to have affected the outcome of the trial. *People v Morey*, 230 Mich App 152, 163; 583 NW2d 907 (1998).

### B. ALLEGED IMPROPER ARGUMENT

Finally, asserting a claim of error that was preserved by objection below, defendant argues that the prosecutor shifted the burden of proof during his closing argument by referring to the failure of the defense to produce a telephone bill that may have either confirmed or contradicted a portion of the complainant's testimony. Evidently, the prosecutor was questioning why this was not done during defense counsel's direct examination of defendant's mother. We assume without deciding that the prosecutorial remark at issue improperly criticized the defense for failing to present proofs on this point.

---

[7] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

See *Fields, supra* at 117 (providing as a partial explanation of why the prosecutorial cross-examination at issue in that case was proper because the prosecutor had not suggested that the defendant had a duty to produce an alleged witness). However, assuming without deciding that this implicated defendant's federal and state constitutional rights against self-incrimination, we conclude that any possible error in this regard does not require reversal, because it was harmless beyond a reasonable doubt in light of the highly inconsequential nature of the matter, which related to whether the complainant had telephoned his mother at about 11:30 P.M. on the night of the incidents. *Graves, supra; Anderson, supra.* Thus, defendant is not entitled to relief based on this issue.

Affirmed.