*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 14, 2025
9:28 AM

Plaintiff-Appellee,

v

No. 366741
Wayne Circuit Court
LC No. 19-000764-01-FH

SIDNEY EUGENE WASHINGTON,

Defendant-Appellant.

Before: BORRELLO, P.J., and N. P. HOOD and YOUNG, JJ.

PER CURIAM.

Defendant, Sidney Eugene Washington, appeals as of right his jury-trial convictions of assault with intent to commit criminal sexual conduct involving penetration (AWICSP), MCL 750.520g(1), and two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(h)(*ii*) (committed against a mentally incapable person). Washington was sentenced to concurrent terms of 4½ to 10 years' imprisonment for AWICSP, and 4½ to 15 years' imprisonment for each CSC-II conviction. On appeal, Washington argues: (1) there was insufficient evidence to support his convictions because the prosecution failed to establish that he used his position of authority to coerce the complainant into committing sexual acts; (2) the trial court erred when it denied Washington's motion for mistrial after a testifying officer implied that Washington had taken a polygraph; and (3) Washington's minimum sentence is disproportionate and unreasonable to the offense and the offender. We affirm. However, we remand to the trial court for the ministerial purpose of correcting Washington's presentence investigation report (PSIR) or sentencing investigation report (SIR).

## I. BACKGROUND

This case started with Washington's sexual assault of RH in December 2018. RH was in her mid-80s, suffered from dementia, and resided in an assisted-living facility where Washington worked as a certified nursing assistant (CNA). Despite not being assigned to RH's floor, Washington went to RH's room on the night of the assault. Joann Spears, another CNA at the

-1-

facility, saw Washington and RH engaging in sexual contact in RH's bathroom. The prosecution charged Washington with one count of AWICSP and two counts of CSC-II.[1]

At trial, Spears testified about her responsibilities and witnessing the assault. According to Spears, CNAs worked under a nurse and assisted residents with things they might need, including staying dry during the night and providing water and hydration. She confirmed that Washington was working that evening but was not assigned to the floor where RH resided. Spears was assigned to RH's floor. She initially went to RH's room to care for RH's roommate. When she saw Washington at RH's door, he told her that he came to check on RH to help her locate her purse. Spears asked Washington to help her with another resident.[2] Spears testified that when she finished with the resident across the hall:

> I went back because [RH's] light was on. I know I needed to go back into her room. I went back into her bedroom. She wasn't at her bed. So that was kinda [sic] weird to me cus [sic] she was, like I said when I was in there she was getting ready for bed.

The door to RH's bedroom was open. Spears entered the room and saw that the bathroom light was on, and the bathroom door was open. When she walked past the bathroom, she saw RH standing with the Washington. She stated, "[Washington] was behind [RH] and she was bent over the sink. And [Washington's] pants were down. And [RH's] undergarments were down. And [Washington] was pumping." Spears could not see Washington's genitals, but described their posture, i.e, "bent over the sink," and movement as sexual. Spears thought so "because it looked as [sic] he was humping her. It was pumping actions. It looked like sex." Spears "knew it was sex. It was really nothing more to observe. His pants were down. Her pants were down. And the action of the humping just, it was sex."

When Spears saw what was happening, she began screaming and demanding that Washington get away from RH. Washington tried to explain the situation. Spears then pushed Washington into the hallway, and other staff responded. Spears asked RH what happened. According to Spears, RH was screaming and said, "I'm just glad somebody caught this man. He keep coming [sic] in my house. He keep coming [sic] in my house." Spears testified that RH was "just telling us that this man keep coming [sic] in here raping me."

In addition to Spears's eyewitness testimony, the prosecution introduced testimony and forensic evidence. This included the sexual assault nurse examiner (SANE) that examined RH

---

[1] This was the third amended felony information. Initially, the prosecution charged Washington with third-degree criminal sexual conduct (CSC-III), MCL 750.20d, and AWICSP. The prosecution then amended the information to include one count of third-degree criminal sexual conduct (CSC-III), MCL 750.520d, and two CSC-II charges. It appears that the prosecution moved to dismiss the CSC-III charge, which the trial court granted. The felony information was amended again to one count of AWICSP and two counts of CSC-II.

[2] During his testimony, Washington confirmed that after leaving RH's room, Spears asked him to help her with another resident.

after the assault and collected DNA from her. This also included the testimony of the Michigan State Police (MSP) forensic scientists who analyzed the collected DNA samples. Regarding the DNA evidence, an MSP forensic scientist testified that the analysis led them to conclude that there was a very strong likelihood that Washington was a contributor to the DNA profile for swabs from RH's breasts.

Officer Walter Brent of the Detroit Police Department also testified. He was the officer in charge of the investigation. He testified that he spoke to RH after the incident but was unable to take an official statement from her due to her mental capacity and dementia diagnosis. Critical to this appeal, during his testimony, he made a passing reference to a possible polygraph examination. Officer Brent and the prosecutor had the following exchange during his direct examination:

> *Q*. With regard to this case did you do anything else after the warrant was authorized aside from the two additional things we talked about with the serving of the subpoenas and the lab requests?

> *A*. I did speak to [] [Washington] I think maybe once or twice regarding the polygraph.

> *Q*. Okay.

The defense did not object. But after cross-examining Officer Brent, the parties had an off-the-record discussion with the trial court, and the trial court dismissed the jury. On the record, defense counsel argued that the polygraph reference prejudiced Washington, and a curative instruction could not remedy the prejudice. The trial court observed that the reference was improper but also observed that there was no reference to polygraph results. The trial court denied the motion for a mistrial. And, over defense counsel's objection, the trial court gave the jury a curative instruction.

Washington testified in his own defense. He largely disputed Spears's version of events. According to Washington, after assisting Spears with another resident, he saw that RH was still awake sitting in the bed. He stated that he saw her get up and go to the restroom on her own. Washington testified:

> [W]hen she went in the restroom she didn't close the door all the way cus [sic] we were communicating. And I can see when she stood up off the toilet she stumbled forward. So me being the aid I didn't want her to hit her head on the sink or fall back and hit her head on the toilet. So I rushed in to secure her. I put one hand on her back. I put one [hand] on her chest to stand her up straight. To make sure she got her balance.

Washington claimed that RH was leaning on the sink, and he did not do anything after helping her regain her balance. He testified that he did not touch her and was not in the bathroom with his pants pulled down. "When she got up [off the toilet] she was pulling [her bottoms] up. They wasn't [sic] all the way up. She leaned on the sink. I was [there] to help and assist her to [sic] pulling them up." "I was standing behind her. She was leaning on the sink. And I put my thumbs in her back to alleviate the pain."

-3-

The jury found Washington guilty of AWICSP and two counts of CSC-II. The trial court sentenced Washington in May 2023. Washington's minimum sentencing guidelines range was initially calculated as 36 to 71 months' imprisonment. At the sentencing hearing, the trial court corrected the sentencing guidelines range to 29 to 57 months' imprisonment. The trial court sentenced Washington as stated. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Washington argues that the prosecution presented insufficient evidence to support his two CSC-II convictions. Specifically, he argues that there was insufficient evidence that (1) he was in a position of authority over RH, and (2) he used his position of authority. We disagree in both regards.

"This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). "In analyzing these sufficiency claims, this Court must review the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Powell*, 278 Mich App 318, 320; 750 NW2d 607 (2008) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

"A challenge to the sufficiency of evidence underpinning a conviction implicates due process." *People v Darga*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363178); slip op at 6. "Due process requires that a prosecutor introduce evidence sufficient to justify a trier of fact to conclude that the defendant is guilty beyond a reasonable doubt." *People v Tombs*, 260 Mich App 201, 206-207; 679 NW2d 77 (2003). Regarding a challenge to the sufficiency of the evidence, this Court has stated:

> In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [*People v Johnson*, 340 Mich App 531, 548; 986 NW2d 672 (2022) (quotation marks and citation omitted).]

Washington was convicted of two counts of CSC-II under MCL 750.520c(1)(h)(*ii*), which provides that a person is guilty of CSC-II if he engages in sexual contact with another person and:

That other person is mentally incapable, mentally disabled, mentally incapacitated, or physically helpless, and any of the following:

* * *

(*ii*) The actor is in a position of authority over the victim and used this authority to coerce the victim to submit.

Put differently, the charge has four elements. First, the defendant intentionally *touched the victim's genital area* (or groin, inner thigh, buttock, breast, or clothing covering that area). Second, when the defendant touched the victim it could reasonably be construed as being *done for sexual arousal or gratification*. Third, the victim was *mentally incapacitated* at the time. And fourth, that the defendant *was in a position of authority* over the victim, and *used this authority* to coerce the victim to submit to the act. See MCL 750.520c(1)(h)(ii). See also M Crim JI 20.2; M Crim JI 20.11.

Washington argues that there was insufficient evidence supporting both aspects of the last element. He argues there was insufficient evidence that he was in a position of authority over RH and that he used the authority. We disagree on both fronts.

We begin with evidence of Washington's position of authority over RH. This subelement requires proof of a defendant's practical authority over a victim, rather than a formal position. See *People v Reid*, 233 Mich App 457, 472; 592 NW2d 767 (1999). Washington's attempts to distinguish his case from the relevant precedents are unpersuasive. In *People v Premo*, 213 Mich App 406, 407; 540 NW2d 715 (1995), the defendant was a teacher at a high school and the victims were students. The defendant pinched the victims' buttocks on school premises. *Id*. This Court held that the "defendant was in a position of authority over the student victims and the incidents occurred on school property." *Id*. at 411. In *People v Regts*, 219 Mich App 294, 296; 555 NW2d 896 (1996), the defendant was the victim's psychotherapist and "manipulated therapy sessions to establish a relationship that would permit his sexual advances to be accepted without protest." In *Reid*, 233 Mich App at 472, this Court observed that the "common feature of the situation with the teacher in *Premo* and the psychotherapist in *Regts* is that the victims were in a position of special vulnerability with respect to the defendants." (Citation omitted.) In *Reid*, the defendant worked for an ambulance company. *Id*. at 460. The defendant lacked a formal relationship with the complainant but "offered to help by talking with the complainant" after the complainant's father told the defendant the complainant was experiencing "some problems in school[.]" *Id*. Importantly, this Court noted: "While it is true that [the] defendant in this case did not hold a formal position, such as being a school teacher, we find that inconclusive. There certainly was sufficient evidence to support a finding that [the] defendant was placed in a substantially similar position of practical authority over the complainant." *Id*. at 472 (citation omitted). In other words, it does not matter whether a defendant held a formal position relative to the victim at the time of the assault. Instead, the inquiry is whether a defendant had practical authority over vulnerable victims.

Here, Washington worked as a CNA at the assisted-living facility where RH resided. CNAs worked under nurse supervision and tended to residents' needs. Washington knew RH and worked with her in the past. In fact, he had worked with RH multiple times a week for over a year.

During his testimony, Washington confirmed much of this, stating: "I've assisted her with everything. Her clothes. I've put her in the shower. I've helped her eat. I've helped her find things." He stated that RH had dementia, "[a]nd so sometimes she would forget like where her room was or you know [staff needed to] just kinda [sic] redirect[] her."

As in *Premo* and *Regts*, RH was "in a position of special vulnerability with respect to" Washington. *Reid*, 233 Mich App at 472 (citation omitted). She had dementia and needed help from the facility's staff. Washington admitted to providing this help on numerous occasions and in a variety of ways. Despite not being assigned to RH's floor on the night of the incident, Washington stated that he visited her because "[s]he wasn't feeling good." Further, Washington claimed that he went into the bathroom with RH to help her regain her balance, and touched her to stabilize her and give her a back massage. Even though Washington was not assigned to RH's care that night, and "did not hold a formal position" over her that evening as her assigned aide, "[t]here certainly was sufficient evidence to support a finding that [he] was placed in a substantially similar position of practical authority" over her. *Id*. (citation omitted). As a result, there was sufficient evidence to establish that Washington was in a position of authority over RH.

Next, Washington argues that there was insufficient evidence that he *used* his position of authority to coerce RH into committing sexual acts. We again disagree.

In the related context of first-degree criminal sexual conduct, this Court has held that coercion "may be actual, direct, or positive, as where physical force is used to compel [an] act against one's will, *or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse.*" *Id*. at 469 (quotation marks and citation omitted). In *People v Knapp*, 244 Mich App 361, 369; 624 NW2d 227 (2001), this Court stated "that the holding and analysis in *Reid* is persuasive and equally applicable to CSC II." This Court also stated that a "defendant's conduct constitutes coercion where . . . the defendant abuses his position of authority to constrain a vulnerable victim by subjugation to submit to sexual contact." *Id*. This Court emphasized, "coercion by a person in a position of authority does not require a showing of physical violence but can be shown through evidence of the exploitation of a victim's special vulnerability." *Id*. at 370. Indeed, "[f]orce or coercion is . . . determined in light of all the circumstances." *Reid*, 233 Mich App at 468 (quotation marks and citation omitted; alteration in original).

Here, the totality of the circumstances establishes that Washington exploited RH's "special vulnerability" in order to have her submit to sexual contact. See *id.* See also *Knapp*, 244 Mich App at 369-370. As discussed, RH's dementia made her vulnerable, and Washington was in a position of authority over her. By Washington's own admission, he was in the bathroom with RH on the night of the incident to stabilize her and prevent her from falling:

> So *me being the aid* I didn't want her to hit her head on the sink or fall back and hit her head on the toilet. So I rushed in to secure her. I put one hand on her back. I put one [hand] on her chest to stand her up straight. To make sure she got her balance. [Emphasis added.]

-6-

She leaned over the sink, and Washington stood behind her with his hands on her, effectively constraining her. Considering all the circumstances, there was sufficient evidence to establish that Washington's actions amounted to coercion.

Washington nonetheless argues that because "the record shows that [Washington] did not do any acts or make statements linking the alleged sexual acts to his position as a nurse assistant, he should not be held criminally liable for [CSC-II]." He admitted to being in RH's room. Further, he asserted that he entered the bathroom because he was an aide and did not want her to fall. These facts link his actions to his position as a nurse assistant. His position is what gave him access to RH's room and to RH. This Court has held, "coercion by a person in a position of authority does not require a showing of physical violence but can be shown through evidence of the exploitation of a victim's special vulnerability." *Knapp*, 244 Mich App at 370. We conclude that there was sufficient evidence to sustain his convictions.

### III. MISTRIAL OVER POLYGRAPH EVIDENCE

Next, Washington argues that the trial court abused its discretion when it denied his motion for a mistrial after the officer in charge referenced a polygraph on direct examination. Washington contends that the trial court's cautionary instruction was insufficient to cure prejudice. We disagree.

"The denial of a motion for a mistrial is reviewed for an abuse of discretion." *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted).

A trial court should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). "Normally, reference to a polygraph test is not admissible before a jury." *People v Nash*, 244 Mich App 93, 97; 625 NW2d 87 (2000). Concern with the polygraph arises because the quality it "attempts to measure—the truthfulness of a witness—is . . . directly related to the essence of the trial process." *People v Ray*, 431 Mich 260, 265; 430 NW2d 626 (1988) (quotation marks and citation omitted). But a reference to a polygraph test "does not always constitute error requiring reversal . . . ." *Nash*, 244 Mich App at 98. Reversal is unwarranted if the reference is "brief, inadvertent and isolated." *Id.* (quotation marks and citation omitted). That was the case here.

This Court has identified a number of factors to determine whether a reference to a polygraph requires reversal:

> (1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted. [*Id.* (quotation marks and citation omitted).]

Here, these factors weigh against reversal. Regarding the first factor, defense counsel objected shortly after Officer Brent's statement. The trial court offered a curative instruction, which defense counsel declined. The first factor therefore weighs in favor of reversal. See *id*.

The second factor considers whether the reference was inadvertent. *Id*. The following exchange occurred between Officer Brent and the prosecutor during direct examination:

> *Q*. With regard to this case did you do anything else after the warrant was authorized aside from the two additional things we talked about with the serving of the subpoenas and the lab requests?
>
> *A*. I did speak to [] [Washington] I think maybe once or twice regarding the polygraph.
>
> *Q*. Okay.

It appears that Officer Brent's statement was unresponsive and inadvertent.[3] But the prosecutor moved on after Officer Brent's statement, and defense counsel began cross-examination. There is no indication in the record that "the prosecutor's question invited the given answer." *Nash*, 244 Mich App at 99. As a result, this factor weighs against reversal.

The third factor considers whether there were repeated references to the polygraph. *Id*. at 98. There were not. Officer Brent only referred to the polygraph once. This factor weighs against reversal.

Regarding the fourth factor, Officer Brent's reference to the polygraph did not appear to be an attempt to bolster or hinder credibility. The issue of the polygraph was raised in the context of Officer Brent's investigation. Officer Brent was the officer in charge of the case. The prosecutor's question appears to be an attempt to allow Officer Brent to provide further information about the thoroughness of his investigation. Because there is no indication that the reference to the polygraph was an attempt to add credibility, this factor weighs against reversal. *Id*.

The fifth factor (i.e., whether results of the test were admitted) is most fatal to Washington's argument. The results were not admitted at trial. And Officer Brent's statement did not clearly indicate that Washington submitted to a polygraph examination. In *Nash*, the witness "referenced *taking* the polygraph test . . . ." *Id*. at 101 (emphasis added). Although the witness did not refer to "the results of the test[,]" this Court held that "[h]ad the witness not passed the lie detector test, she would not have responded, effectively, that she should be believed on the basis of the results of the lie detector test." *Id*. In other words, this Court concluded that a jury could infer that the witness passed the test by her willingness to state she had taken it. Unlike *Nash*, whether Washington submitted to a polygraph was unclear. Officer Brent did not say, "I spoke with

---

[3] We acknowledge that an experienced officer should not have made this mistake.

[Washington] regarding the polygraphs *results*." Or, "regarding the polygraph test *you* took." It is unclear whether a test had even been conducted. Therefore, this factor weighs against reversal.

Four of the five factors weigh against reversal. On this basis alone, the trial court did not abuse its discretion when it denied Washington's motion for a mistrial. But the trial court went further and gave a curative instruction to correct any residual prejudice:

> Ladies and gentlemen of the jury you just recently heard from, testimony from the officer in charge of this case and I am going to instruct you that any remark that was made with respect to a polygraph should be disregarded. Polygraphs are new [sic] notoriously unreliable and are inadmissible in a court of law in the state of Michigan. Strike it from your mind. Act like you didn't hear it.

"Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). As a result, the trial court did not abuse its discretion when it denied Washington's motion for mistrial.

## IV. PROPORTIONALITY

Finally, Washington argues that his sentence was disproportionate. We disagree.

"[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality'[.]" *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). This "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 460 (quotation marks and citation omitted). A "trial court has abused its discretion in applying the principle of proportionality by failing to provide adequate reasons for the extent of the departure sentence imposed . . . ." *Id*. at 476.

Our Supreme Court has "held that unusually excessive imprisonment is forbidden by Article 1, § 16 of the Michigan Constitution." *People v Parks*, 510 Mich 225, 241; 987 NW2d 161 (2022). Further, "our Constitution requires that sentencing decisions be proportional." *Id*. A within-guidelines sentence is reviewed for proportionality even when there are no scoring errors or inaccurate factual statements. *People v Posey*, 512 Mich 317, 326; 1 NW3d 101 (2023). In *Posey*, our Supreme Court held: "[W]ithin-guidelines sentences are to be reviewed for reasonableness, but . . . the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate[.]" *Id*. at 359. As recognized, "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range[.]" *Steanhouse*, 500 Mich at 475 (quotation marks and citation omitted). Stated differently, *all* "sentences imposed by the trial court [must] be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 474 (quotation marks and citation omitted). "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the

offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022).[4]

The trial court sentenced Washington within his advisory sentencing guidelines. The sentencing guidelines range was 29 to 57 months. The trial court sentenced Washington to 4½ to 10 years for AWICSP, and 4½ to 15 years for each count of CSC-II. This was near the top of the applicable guidelines range.

Washington argues that this sentence was disproportionate to the circumstances surrounding the offense and his lack of a prior criminal history. We disagree. This case involved a CNA attempting to have sex with an octogenarian suffering from dementia at a nursing home where he worked. The sentence was proportionate.

At sentencing, Washington conceded that the sentencing guidelines were scored correctly and requested that the trial court sentence him within the guidelines. On appeal, Washington contends that he lacked a criminal record and is a "56 year old man with absolutely no prior criminal history[.]" This argument ignores the fact that his lack of a criminal record was already accounted for by the prior record variables. See MCL 777.21(1)(b) ("Score all prior record variables for the offender as provided . . . .").

Washington worked as CNA at a facility and was in a position of authority over his charges, especially RH, who was vulnerable because of her dementia. As discussed, Washington abused his position of authority to coerce RH, who was mentally incapacitated, into sexual contact. He admitted to visiting her often and helping her, essentially gaining her trust. On the night of the assault, he was on RH's floor despite not being assigned to work there, and did not leave after helping Spears with another patient. Instead, Washington returned to RH's room where Spears observed him engaging in a sexual act with RH in her bathroom. RH was in her 80s. Witnesses described her as pleasant but easily confused. Washington knew that RH was "sickly" and needed additional help on some days. Washington exploited her condition, which led to her transfer to a new facility and invasive forensic testing at the hospital where RH was unable to articulate what happened. Nothing in the record supports Washington's contention that his sentence was disproportionate to his offense. Washington failed to demonstrate that his "within-guidelines sentence is unreasonable or disproportionate[.]" *Posey*, 512 Mich at 359. We therefore affirm.

Although we affirm Washington's sentence, we remand to the trial court for the ministerial purpose of correcting Washington's PSIR or SIR. At sentencing, the trial court changed the point assessment for several offense variables. These changes resulted in Washington's minimum guidelines range being 29 to 57 months' imprisonment rather than 36 to 71 months' imprisonment as noted in the PSIR or SIR.

---

[4] In his brief on appeal, Washington refers to the factors from *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972) ("certain basic considerations were found to be proper in determining an appropriate sentence: (a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses."). Our Supreme Court recently reiterated these factors in *Boykin*, 510 Mich at 183.

## V. CONCLUSION

For the reasons previously discussed, we affirm Washington's convictions and sentences. We remand to the trial court solely for the ministerial purpose of correcting Washington's PSIR or SIR. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Noah P. Hood
/s/ Adrienne N. Young