*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CARL MARSHALL PRICE,

Defendant-Appellant.

UNPUBLISHED
November 19, 2019

No. 344931
Ingham Circuit Court
LC No. 16-000946-FC

Before: O'BRIEN, P.J., and GADOLA and REDFORD, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of voluntary manslaughter, MCL 750.321, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to a prison term of 86 to 180 months for the voluntary manslaughter conviction, and to a consecutive two-year term for the felony-firearm conviction. Defendant appeals as of right, and we affirm.

## I. FACTS

On August 18, 2016, defendant fatally shot Robert Wray in front of defendant's home. Defendant admits that he shot Wray but contends that he acted in self-defense.

Before the confrontation, defendant and Wray apparently were not acquainted. At about 7:30 p.m. that day, Wray left home driving a car that belonged to his girlfriend, Leslie Latham. According to Latham, Wray was in a good mood when he left their home and planned to visit a friend. Latham also testified that Wray had been drinking alcohol throughout the day.

At some point during his drive, Wray drove past defendant and a group of men playing basketball in the street in front of defendant's home. According to defendant's statement to police, Wray was driving fast and almost hit defendant with his car. The record is not clear regarding whether there was a confrontation at that time between Wray and the basketball players. According to Latham, Wray returned home at 8:50 p.m. and changed into all black clothing, then took a black and gray 9 mm gun and a mask from a bedside drawer. Latham testified that Wray appeared angry and refused to respond to her questions about where he was

-1-

going. A blood test later revealed that Wray had a blood alcohol level of .241, and also revealed the presence of THC, which is associated with marijuana use.

Wray's daughter, Jazmin Wray, testified that at this point she was in Latham's car because Wray had picked her up from her home, near defendant's home. Wray drove Jazmin back to her home where he parked the car. Wray told Jazmin he would be right back and walked toward defendant's house. Jazmin later testified that she did not see Wray carrying either a gun or a mask.

When Wray arrived on the sidewalk in front of defendant's house, an argument broke out between Wray and some of the basketball players. According to defendant's initial statement to police, he was in the house when he heard his sister arguing with Wray. He went outside and saw Wray arguing and wrestling with one of the basketball players; Wray appeared to be intoxicated or high. Initially, defendant told police that he did not know the names of the other basketball players. Defendant joined the group of basketball players, armed with his .45 caliber gun for which he had a concealed weapon permit. Defendant told police that he saw one of the men, later identified as Dennis Wardlaw, struggling with Wray on the ground and attempting to wrest the gun from Wray. He heard two shots fired, then heard two more shots fired and felt a gunshot graze his leg. Defendant told police that when he saw Wray attempt to stand up, he fired his gun. He explained that his first shot did not hit Wray, and so he walked toward Wray, and continued to shoot until he had fired all eight bullets from his gun. He estimated that he had hit Wray two or three times. He further told police that he did not believe that anyone else shot Wray.

Police arrived at the scene shortly after the shooting. Defendant was standing on the porch of his home with his hands up. He was cooperative with police and told them that some guy had "come here with some b*** sh**," and that he had shot the man. Later that night, defendant gave a statement to police. He told officers that he had never seen Wray before that day and only confronted Wray after hearing his sister arguing with him in the yard, and upon seeing the other men in the yard wrestling with Wray. He again admitted that he shot Wray. Defendant was arrested.

Four days later, defendant requested to speak with the detectives again. During this interview, defendant admitted that he knew the other men and identified them as his brother, Kevin Price, and three other men with street names of Truth (Dennis Wardlaw), Trill (Darnell Wardlaw), and Red (Tory Crusoe). Defendant told police that he was in his home when he heard Wray arguing with the men outside. Defendant went outside and joined the other men who had surrounded Wray. Dennis Wardlaw confronted Wray and suggested that they fist fight in the street. In response, Wray began to pull out a 9 mm gun. Defendant told police that Wardlaw and Wray began to struggle for the gun and fell to the ground; then Wray fired two shots. The other men scattered, two more shots were fired from Wray's gun, and defendant felt a bullet graze his leg. Defendant told police that when he saw Wray start to stand back up, he was afraid that Wray would stand over Wardlaw and shoot him, then empty his gun on the others standing in the yard, including defendant's sister. Defendant shot Wray in the back, and the victim did not get up again. Defendant told police that he was the only person who shot Wray and that he did not know who else had been shooting.

The police investigation later determined that Wray had been shot six times, including a gunshot to the back of his head, which was fatal. Dennis Wardlaw had been shot twice, and defendant received a minor injury when a bullet grazed his leg. The investigation also revealed that Wray's gun had been fired five times, defendant's gun had been fired eight times, and another gun had been fired four times. Sergeant Michael Lee testified that he examined the firearms, bullet fragments, and shell casings discovered at the scene of the shooting. Police found four .40 caliber shell casings, five 9 mm shell casings, and eight .45 caliber shell casings. Police determined that the eight .45 caliber shell casings came from the .45 caliber gun registered to defendant and found at the scene of the shooting. The five 9 mm shell casings had been fired by a tan camouflage-colored 9 mm gun found underneath Wray, including a shell casing fragment found in Dennis Wardlaw's clothing. The magazine of the 9 mm gun had four rounds remaining in it, and there was an additional round in the chamber of the gun. One of the shots that hit Wray and one of the shots that hit Wardlaw were from a .40 caliber gun. A .40 caliber gun was not located at the scene.

The forensic pathologist examining Wray testified that he had died as the result of gunshot wounds, specifically a gunshot wound to the head. Wray had been shot six times, once in the head, twice in the back, once in the front below his right shoulder, once in the arm, and once in the leg. The gunshot wound to the head had been fatal; the other gunshot wounds were not necessarily fatal, although could have been fatal if sufficient blood loss had occurred. The gunshot wound to Wray's leg had been caused by a shot fired from a .40 caliber gun, and the gunshot wounds to Wray's back and head were fired from a .45 caliber gun.

Defendant was charged with second-degree murder and felony-firearm. At the conclusion of trial, the jury convicted defendant of voluntary manslaughter and felony-firearm. Defendant now appeals.

## II. DISCUSSION

## A. SUFFICIENCY OF THE EVIDENCE

Defendant challenges the sufficiency of the evidence, contending that the prosecution failed to produce sufficient evidence to sustain the prosecution's burden of disproving that defendant acted in self-defense. We disagree.

The due process clause, US Const, Am XIV, requires that every element of a crime be proven beyond a reasonable doubt to sustain a criminal conviction. *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979). The elements of the crime may be satisfied by circumstantial evidence and reasonable inferences arising from that evidence. *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). The inferences drawn from the evidence, and the weight to be accorded those inferences, are decided by the jury, and not by this Court on appeal. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Although this Court reviews de novo a challenge to the sufficiency of the evidence, *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014), we review the evidence in the light most favorable to the prosecution to determine whether the evidence was sufficient for a rational trier of fact to find that the elements of the crime were established beyond a reasonable doubt. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018). This standard is deferential, and as the reviewing court

-3-

we are "required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id*.

In this case, defendant was charged with second-degree murder and convicted of voluntary manslaughter. Voluntary manslaughter is established when the evidence demonstrates that the defendant "killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Reese*, 491 Mich 127, 143; 815 NW2d 85 (2012) (quotation marks and citation omitted). The element that distinguishes second-degree murder from manslaughter is malice, which is an element of murder that is negated in voluntary manslaughter by the presence of provocation and heat of passion. *Id*. at 152. Thus, provocation is not an element of manslaughter, but rather is a circumstance that negates the presence of malice. *People v Mendoza*, 468 Mich 527, 536; 664 NW2d 685 (2003). A defendant acts with malice where he acts with "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Henderson*, 306 Mich App 1, 9-10; 854 NW2d 234 (2014) (quotation marks and citation omitted). The degree of provocation necessary to negate malice is that which causes a defendant to act out of passion rather than reason. *People v Tierney*, 266 Mich App 687, 714-715; 703 NW2d 204 (2005).

Here, defendant does not dispute that the prosecution established the elements of voluntary manslaughter, but instead contends that he produced evidence to establish a prima facie case of self-defense, and that the burden then shifted to the prosecution to disprove that defendant had acted in self-defense, and that the prosecution in this case failed to carry that burden of proof. Self-defense is an affirmative defense that justifies otherwise punishable criminal conduct and applies when the defendant acted intentionally but under circumstances that justified his or her actions. *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010). The Self-Defense Act (SDA), MCL 780.971, *et seq*., codified the circumstances in which a person is justified in using self-defense. *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). With respect to the use of deadly force, the SDA provides, in relevant part:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> > (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. [MCL 780.972.]

When a defendant asserts self-defense, he or she is obligated to satisfy the initial burden of producing evidence to establish the elements of a prima facie case of self-defense. *People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014). Once a defendant satisfies the initial burden of setting forth a prima facie case of self-defense, the burden shifts to the prosecution to exclude beyond a reasonable doubt the possibility that the killing was done in self-defense. *Dupree*, 486 Mich at 710, 712.

-4-

In this case, defendant produced evidence to set forth a prima facie case of self-defense. The evidence suggests that on the evening of August 18, 2016, defendant and several other men were playing basketball in the street outside defendant's home and had some sort of encounter with Wray as he drove by. Wray returned home, changed into black clothing, and retrieved a gun and a mask. He appeared angry, and quarreled with his girlfriend, refusing to explain where he was going. Shortly thereafter, Wray arrived in front of defendant's home angry, highly intoxicated, and armed with a loaded gun.

Upon hearing the argument between Wray and Wardlaw, defendant, armed with his own gun, joined the group of men. Dennis Wardlaw confronted Wray, who pulled out his gun. Wardlaw and Wray then struggled for Wray's gun. Shots were fired, and defendant felt a gunshot graze his leg. Defendant then saw Wray starting to stand up. Defendant told police that he feared that if Wray stood up he would stand over Wardlaw and shoot him and "empty his clip on everybody," including defendant's sister who was nearby. Defendant told police that he therefore shot repeatedly at Wray, and believed that he hit Wray at least two times. Ballistics evidence verified that five shots were fired from Wray's gun. These facts provide evidence on the elements of self-defense, supporting defendant's assertion that he honestly and reasonably believed that the use of deadly force was necessary to prevent the imminent death of or bodily harm to himself or others. The burden then shifted to the prosecution to disprove beyond a reasonable doubt the possibility that the killing was done in self-defense. See *Dupree*, 486 Mich at 710, 712.

The prosecution argues that it met its burden of disproving defendant's self-defense claim by demonstrating that defendant's version of events was not credible because it was contradicted by the evidence and also by the inconsistencies in defendant's statements. We agree that the prosecution produced sufficient evidence from which the jury could conclude that defendant's theory of self-defense had been disproven beyond a reasonable doubt.

Defendant's theory of self-defense was that he acted to defend himself and others when Wray began to fire his gun because he reasonably and honestly believed that he needed to act with deadly force. Defendant told police that he shot Wray only after Wray shot four times. The weight given this assertion depends in large part upon the credibility of the person asserting it, the determination of which is the province of the jury. *People v Young*, 472 Mich 130, 143; 693 NW2d 801 (2005). Here, the details of defendant's two statements to the police were contradictory in part. During his second interview, defendant admitted that initially he had lied about not knowing the identities of the other men, and lied when he told police that he heard his sister arguing with Wray. Initially, defendant claimed that he watched from the porch as Wray began wrestling with one of the people on the lawn, but in the second interview, defendant admitted that he was standing with the other men when the fight began. Although these discrepancies alone do not establish that defendant did not act in self-defense or defense of others, it does provide the jury with facts from which to measure defendant's credibility.

The prosecution also presented conclusive evidence that, contrary to defendant's statements, defendant and Wray were not the only shooters. The ballistics evidence presented by the prosecution supports the conclusion that some other shooter fired four shots from a .40 caliber gun, one of the shots hitting Wray. This evidence casts doubt on defendant's version of the events and also upon the level of peril confronting defendant and whether it was necessary

for him to act with deadly force and deliver the fatal shot to Wray. Accordingly, the prosecution submitted sufficient evidence from which a jury could conclude that defendant's assertion of self-defense was disproven beyond a reasonable doubt.

## B. PROSECUTORIAL MISCONDUCT

Defendant also contends that during trial the prosecutor engaged in prosecutorial misconduct by vouching for witnesses and denigrating defendant, thereby depriving him of a fair trial. We disagree.

We note that defendant failed to preserve this issue for appellate review by objecting to the prosecutor's conduct at trial and requesting a curative instruction. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016). We review unpreserved claims of prosecutorial misconduct for plain error affecting substantial rights. *People v Norfleet*, 317 Mich App 649, 660 n 5; 897 NW2d 195 (2016). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant, or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (quotation marks and citation omitted).

The test of prosecutorial misconduct is whether the prosecutor committed errors that denied the defendant a fair and impartial trial. *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). We evaluate a prosecutor's statements in light of the defense arguments and their relationship to the evidence admitted. *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

In this case, defendant argues that during closing argument the prosecutor unfairly vouched for the truthfulness of Latham and Officer Kevin Marshall. A prosecutor may not "vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). Further, the prosecutor may not vouch for a witness's credibility based on an assertion of the prosecutor's integrity or the prestige of the position. *People v McGhee*, 268 Mich App 600, 633; 709 NW2d 595 (2006). But a prosecutor may argue that a witness is credible. *Id.*

Defendant first cites the following statement by the prosecutor in closing: "You saw, ladies and gentlemen, what we assert to you is the extremely calm and professional manner in which Officer Kevin Marshall approaches this scene and interacted with the defendant and diffused the situation." This comment addressed the job performance of the responding officer at the scene of the crime, and was not a comment on the testimony of Officer Marshall. The prosecutor went on to summarize the activities of the officers who responded to the scene and investigated the case, arguing that the evidence gathered by police provided the foundation for the truth. The prosecutor was commenting on the quality of work that produced the evidence, rather than on the prosecutor's special knowledge about the veracity of the officer's testimony. This was not a "vouching" statement.

Defendant also cites the following comments by the prosecutor in closing:

Leslie Latham gave us in this case what the people will assert to you was actually credible testimony, because Leslie Latham, as defendant's [sic] girlfriend or close

friend or roommate, did not say anything particularly favorable about the . . . victim on the night in question. She said that he had been out and arrived home approximately 8:50. He initially appeared to be in an okay mood but then she noticed that his mood had changed. She admitted that Robert was a drinker, and she told us that particular day Robert had been drinking all day, and we know in this case that's consistent with what we saw in Mr. Wray's blood alcohol level when he was autopsied.

Prosecutors are allowed great latitude in their closing arguments and generally are free to argue the evidence and all reasonable inferences from the evidence relating to their theory of the case. *Unger*, 278 Mich App at 236. In this case, the prosecutor's comment regarding Latham was a proper comment on how the evidence related to Latham's testimony, and did not rise to the level of vouching. The prosecutor asserted that her testimony was credible, but did not base this argument on special knowledge or the prestige of the prosecutor's office, but on the evidence corroborating the witness's testimony. *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1998) (it is not vouching for the witness to argue that the facts and evidence demonstrated that the witness was credible). In fact, the prosecutor argued that Latham's testimony could be considered credible because she said things that painted the victim, her boyfriend, in a somewhat unfavorable light. This was not improper argument.

Defendant also argues that the prosecutor denigrated defendant when he stated:

> We hear that [defendant] was sober. It is precisely because he was sober that night that his statements to the police are egregious. The defendant argued in this case that [he] put his hands up. He put his gun on the ground. He was complying. He did all of these things. Doesn't it seem somewhat contrived to have done that when he was taken to the police station and he proceeded to lie and deceive over and over and over and over? Doesn't that just seem contrived?

It is improper for a prosecutor to denigrate a defendant "with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 283. However, prosecutorial comments must be read as a whole and evaluated in context, including the arguments of the defense and the relationship they bear to the evidence. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Defendant argues that the prosecutor's remarks denigrated his character, implied he lacked respect for the criminal justice system, denigrated his integrity, and encouraged the jury to convict based on emotional feelings. The prosecutor's remarks were made in rebuttal to defendant's closing argument. One of defendant's arguments was that he acted in self-defense as evidenced by the fact that he was sitting at home while sober when he was attacked, and that he was then cooperative; he disabled his weapon, surrendered to the police, and admitted his involvement. In rebuttal, the prosecutor argued that inconsistencies in defendant's statements meant that although he was cooperative, he was not truthful, and therefore his interactions with the police were contrived and dishonest. When a defendant advances evidence or a theory, prosecutorial argument on the inferences created is proper. *People v Reid*, 233 Mich App 457, 477; 592 NW2d 767 (1999). A prosecutor may even argue from the evidence that a witness is unworthy of belief, *id.* at 478, and "need not confine argument to the blandest possible terms." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2014). The prosecutor's comments during

closing argument did not improperly vouch for the credibility of witnesses, and did not improperly denigrate defendant's character.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Michael F. Gadola
/s/ James Robert Redford