*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 4, 2021

Plaintiff-Appellee,

v

No. 347629
Wayne Circuit Court
LC No. 18-005003-01-FC

AARON DION FRANKLIN,

Defendant-Appellant.

Before: CAVANAGH, P.J., and JANSEN and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of first-degree home invasion, MCL 750.110a(2), assault with intent to do great bodily harm less than murder (AWIGBH),[1] MCL 750.84(1)(a), assault with a dangerous weapon (felonious assault), MCL 750.82, and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 10 to 35 years' imprisonment for his first-degree home invasion conviction, 10 to 35 years' imprisonment for his AWIGBH conviction, 5 to 15 years' imprisonment for his felonious assault conviction, and two years' each for his felony-firearm convictions. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

At the time the crimes occurred, the complainant, Willie Jackson (Jackson), was married and living with Latrice Jackson (Latrice) on Woodbine Street in Redford Township, Michigan. Defendant and Latrice had a 14-year-old child together, JF. JF lived with defendant but sometimes stayed with his mother at the Woodbine address.

---

[1] Defendant was charged with assault with intent to commit murder, MCL 750.83, but was ultimately convicted of the lesser included offense of AWIGBH.

On June 2, 2018, there was a carnival a few blocks from the Woodbine residence. JF was staying with defendant, who gave JF permission to go to the carnival. At the Woodbine residence, Jackson was home with his other children while Latrice was out with friends for the evening. Jackson was preparing to take the children to the carnival when JF and some of his friends arrived at the Woodbine residence. JF told Jackson that some people had chased him and his friends from the carnival.[2] JF asked Jackson if they could stay at the house because they were concerned about being attacked if they went back outside. After ensuring that no one was following the boys, Jackson told JF that he and his friends could not stay at the home alone, and so one of JF's friends called someone for a ride. Jackson went to the carnival with the other children.

Latrice testified that JF called her and explained what had happened at the carnival. She stated that she then called defendant, told him about the incident at the carnival and asked him to go to the Woodbine house and pick up JF. She testified that she then called Jackson and informed him that defendant was coming to the house. Defendant arrived at the Woodbine house shortly after Jackson had left to purchase cigarettes at a nearby gas station. Both Jackson and defendant testified. They agreed that they had known each other for about 12 years and that they did not have any difficulties with each other until that night.

According to Jackson's testimony, he did not know that defendant was coming to the house and was concerned when he returned home from the gas station and found the front door open. He entered the house and was shocked to see defendant coming down the stairs from the upper floor, looking "deranged" and holding a gun. Jackson testified that he attempted to wrestle the gun away from defendant. At some point during the interaction, Jackson was shot one time in the abdomen. Jackson testified that he did not keep a gun in the house and that he did not own any guns.

Police Officer Joe Haapala testified to the events upon the arrival of the police. He testified that he spoke to Jackson's eleven-year old daughter, AJ. Haapala testified that AJ was very upset and crying. She said she had been sleeping on a couch when defendant shot into the ceiling near the couch and that she was afraid he would shoot her. Photographs of the purported bullet hole in the ceiling were admitted into evidence, and Happala testified to finding drywall dust on the couch.

Testifying in his own defense, defendant asserted that Jackson was the aggressor and that he acted in self-defense. He testified that Latrice called him and told him that their son was chased from the carnival. Latrice was concerned that JF was in danger and asked defendant to pick him up from the Woodbine house. Defendant testified that he then drove to the house and honked the car's horn as he typically did when picking up JF. When no one answered, defendant grew concerned for JF's safety and walked up to the house, knocked on the screen door and again received no response. He grew more concerned because the main front door (not the screen door) of the house was open. He stepped inside the house and called out for JF, again receiving no response. He stated that he walked up two or three stairs to call out to the upper floor but concluded after again getting no response that JF was not there and turned to leave. He testified that as he came down the stairs he saw Jackson coming through the front door. According to defendant,

---

[2] According to defendant, JF went to the Woodbine address rather than defendant's home because it was closer to the carnival.

Jackson stood in the doorway blocking his exit and said "what the f are you doing in my house." Defendant further testified that he told Jackson he had come looking for JF, at which point Jackson swore at him and began to pull out a gun. Defendant stated that it felt as though he was being ambushed and that he tried to grab Jackson before he could fully get the gun out. A struggle ensued during which the gun went off, but defendant did not realize that Jackson was hit.[3] The struggle continued for some time and eventually defendant got Jackson down on the ground and Jackson stopped fighting. Defendant stated that he took the gun so that Jackson would not be able to shoot him as he left and that he threw the gun in a lot across the street and drove away.

Given the charge of home invasion, a central issue at trial was whether or not defendant had permission to enter the Woodbine house. All agreed that defendant had come to the house many times to pick up JF. He typically would pull in the driveway and honk the horn, but Latrice and defendant each testified that defendant had come inside the house several times before. Latrice testified that defendant had permission to enter the home at any time if there was a concern about JF's welfare. The prosecution impeached Latrice with the fact that she answered negatively when an officer asked her whether defendant had permission to enter the house that evening. She explained on cross-examination that her understanding of the officer's question was whether defendant had explicitly asked her for permission that evening, which he did not, and that the officer did not ask about their understanding that defendant could go in the house if there was concern about JF's safety.

Contrary to Latrice's testimony, Jackson testified that he did not know that defendant was coming to the house. However, when interviewed that night by a police officer, Jackson told the officer that Latrice had called him and told him that defendant was coming. Defense counsel did not, however, impeach Jackson with this statement or seek to introduce it as direct evidence. Thus, the jury heard only Jackson's denial that he knew of defendant's imminent arrival.

Defendant was ultimately convicted on both counts and this appeal followed. Along with his brief on appeal, defendant moved this Court to remand for a *Ginther*[4] hearing regarding his claim of ineffective assistance of counsel. We granted the motion,[5] the *Ginther* hearing was held, and defendant's motion for a new trial was ultimately denied by the trial court. The case is now before us for plenary review.

---

[3] Defendant testified that when he left he still did not know that Jackson had been shot, and a police officer who arrived later testified that it was not readily apparent where Jackson had been shot.

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] *People v Franklin*, unpublished order of the Court of Appeals, entered November 13, 2019 (Docket No. 347629).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that the trial court erred by denying his motion for a new trial on the basis of ineffective assistance of counsel. We disagree.[6]

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016), citing US Const, Am VI; Const 1963, art 1, § 20. The United States Supreme Court has held that "in order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jackson*, 313 Mich App at 431 (quotation marks and citation omitted).

Defendant asserts that he is entitled to a new trial because his defense counsel was constitutionally ineffective by failing to impeach Jackson with his statement to the police that he was aware defendant was coming to the Woodbine house. "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Muhammad*, 326 Mich App 40, 66; 931 NW2d 20 (2018) (quotation marks and citation omitted). However, defense "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

The record produced during the *Ginther* hearing showed that Jackson had told the police that Latrice had called and told him that defendant was coming to the house on the night in question. Although Jackson told the police that he was not aware of defendant's reason for coming to the house, he said that he assumed that it was related to his interaction with JF earlier in the day concerning the incident at the carnival. At the *Ginther* hearing, defense counsel testified that he

---

[6] "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Brown*, 279 Mich App 116, 140; 755 NW2d 664 (2008). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Brown*, 330 Mich App 223, 234; 946 NW2d 852 (2019) (quotation marks and citation omitted).

believed Jackson's trial testimony contradicted the statement he gave to the police. Counsel further testified that he had intended to impeach Jackson with that statement, but that he forgot to do so.

Upon considering the testimony and the statement to police, the trial court determined that it was not objectively reasonable for defense counsel to allow Jackson's trial testimony to go unchallenged. We agree and conclude that the trial court did not err by concluding that defense counsel's failure to confront Jackson with his statement to the police fell below an objective standard of reasonableness.

Having concluded that counsel's error constituted ineffective assistance, the trial court turned to the next step in a *Strickland* analysis, i.e., whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jackson*, 313 Mich App at 431, (quotation marks and citation omitted). The trial court determined that had counsel impeached Jackson it would not have resulted in a reasonable probability of a different outcome. First, the court noted that Jackson's trial testimony was not necessarily contradicted by his statement to the police because at trial Jackson was not asked whether he knew that defendant was coming over, only if he knew defendant was coming over for the purpose of picking up JF. Indeed, when defense counsel presented the question a second time, Jackson began his response with a qualifier, "[n]o, not to come over to pick up [JF]. I haven't received any information." Because defense counsel's questions about Jackson's knowledge of defendant's plans to come over always related to the purported purpose to pick up JF, Jackson's testimony did not directly contradict his statement to police.

In an attempt to escape that conclusion, defendant argues that defense counsel's failure to clarify Jackson's testimony resulted in the prosecutor's ability to argue that Jackson was surprised by defendant's presence at the Woodbine residence. Defendant contends that the prosecutor's ability to argue surprise was both necessarily reliant on Jackson's misleading trial testimony and severely detrimental to defendant's claim that he was ambushed by Jackson. However, upon reviewing the record, it is clear that even if defense counsel had confronted Jackson with his statement to police, the prosecutor still would have been able to argue that Jackson was surprised on the night in question. This is because, during his interview with police, Jackson specifically stated that he was surprised to find defendant *inside* the house. This coincided with Jackson's trial testimony that, while defendant regularly came to the Woodbine residence to pick up and drop off JF, defendant did not come inside the house. Moreover, Jackson's expression of surprise in his statement to police was supported by the fact that he also told police that defendant did not have permission to enter the house.

Finally, although Jackson and defendant testified to two very different version of events, Jackson's version of events was strongly supported by his daughter's statements to the police immediately after the incident. AJ told Officer Haapala that defendant shot the ceiling near where she had been sleeping on the couch and that she was afraid he would shoot her. AJ's statements were supported by the bullet hole found in the ceiling and the drywall dust found on the couch.

In sum, considering that Jackson would not have been directly impeached by his police statement and the evidence corroborating his testimony, the trial court did not err by concluding that counsel's error was not prejudicial. Accordingly, the trial court did not err by denying defendant's motion for a new trial.

## III. FIRST-DEGREE HOME INVASION CONVICTION

Defendant next argues that there was either insufficient evidence to support his first-degree home invasion conviction or that it was against the great weight of the evidence. We disagree on both accounts.[7]

"MCL 750.110a(2) proscribes the unlawful breaking and entering or entering without permission of a 'dwelling.' " *People v Bush*, 315 Mich App 237, 246; 890 NW2d 370 (2016). Our Supreme Court has held that "first-degree home invasion . . . can be committed in several different ways, each of which involves alternative elements necessary to complete the crime." *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010). In this case, defendant was charged under a theory of entering without permission. The prosecution was required to prove beyond a reasonable doubt that (1) defendant entered the home without permission; (2) that defendant committed an assault when he entered, was present in, or was leaving the dwelling; and (3) when defendant entered, was present in, or was leaving the dwelling, he was armed with a dangerous weapon or another person was lawfully present in the dwelling. See *id*.

Defendant argues only that there was insufficient evidence that he entered the house without permission. " 'Without permission' means without having obtained permission to enter from the owner or lessee of the dwelling or from any other person lawfully in possession or control of the dwelling." MCL 750.110a(1)(c).

During trial, there was testimony from two people who could have legally given defendant permission to enter the Woodbine residence. First, Jackson testified that defendant did not have permission to enter the home. While Jackson acknowledged that it was common for defendant to come to the house to pick up JF, he testified that defendant was not permitted to enter the house. Second, Latrice also lived at the Woodbine house and testified that defendant was allowed to enter the house so long as he was doing so on the basis of concern for JF's well-being. However, in her statement to the police that was admitted into evidence, Latrice said that defendant did not have permission to enter the Woodbine residence on the night in question. Latrice attempted to clarify that statement at trial, explaining that she was answering a specific question—did she specifically tell defendant he could enter the house when she spoke with him that night? While she did not give that express and contemporaneous permission, she testified that defendant had implied

---

[7] "We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "We review for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *Id*.

permission to enter the house if he did so to check on JF. Because she called defendant to go to the house to look in on JF, she testified that he did have permission that night.

Interestingly, the other testimony relating to permission to enter the home came from defendant during cross-examination by the prosecution:

> *Q.* Okay. Now you testified earl[ier] that you have only been in the house two or three times?
>
> *A.* Roughly, yes.
>
> *Q.* Okay. Over the course of twelve years?
>
> *A.* Well they moved a lot. So at this particular house maybe two or three times.
>
> *Q.* Alright. So is it your practice to just honk the horn and you[r] son comes out, right?
>
> *A.* Yes.
>
> *Q.* You don't go in the house?
>
> *A.* No.
>
> *Q.* Okay. So nobody gave you permission to go in that house, right?
>
> *A.* No.

Although the language of the question-and-answer is not entirely clear with regard to whether defendant believed he had permission to enter the house, the implication seems to be that he did not. During redirect, the defense attempted to rehabilitate that testimony by asking if defendant agreed with Latrice's testimony that there was implied permission if entry involved concern for JF. Before he could answer, though, the prosecution objected and the defense withdrew the question. Defendant did, however, state that he had an unspecified "understanding" with Latrice, but did not get into exact detail about permission to enter the home.

At best, defendant has presented us with a fact dispute that required the jury to analyze witness credibility. In pertinent part, defendant contends that no reasonable juror could have believed Jackson's testimony, Latrice's statement to police, and defendant's own testimony that he did not have permission to enter the Woodbine home on the night in question. Instead, defendant asserts that a reasonable juror undoubtedly would have believed Latrice's testimony at trial that defendant had implied permission to enter the house under the circumstances presented in this case. It is clear in this case that the jury decided to believe the testimony and evidence that established that defendant did not have permission to enter the home. When reviewing the sufficiency of the evidence, all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). More specifically, we "must defer to the fact-finder's role in determining the weight of the evidence and

the credibility of the witnesses," and on appeal must resolve those issues in favor of the prosecution. *People v Savage*, 327 Mich App 604, 614-615; 935 NW2d 69 (2019) (quotation marks and citation omitted). Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to establish that defendant entered the Woodbine address without permission. Because that is the only element challenged by defendant, there was also sufficient evidence to sustain his conviction of first-degree home invasion.

Defendant's alternative argument that the jury's verdict was against the great weight of the evidence fails for the same reasons just discussed. Given the evidence that defendant did not have permission to enter the home, the evidence did not preponderate heavily against the verdict. See *People v Solloway*, 316 Mich App 174, 182-183; 891 NW2d 255 (2016).

## IV. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor committed misconduct requiring reversal and a new trial. Again, we disagree.[8]

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *Lane*, 308 Mich App at 62-63. "Generally, '[p]rosecutors are accorded great latitude regarding their arguments and conduct.' " *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation omitted).

Defendant first argues that the prosecutor committed misconduct by failing to correct alleged perjury by Jackson, i.e., that Jackson did not expect defendant at the Woodbine address on the night in question. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016) ("If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."). However, the prosecutor never asked or elicited testimony from Jackson related to whether he expected defendant at the home. Instead, the challenged testimony occurred during defendant's cross-examination of Jackson. Thus, defendant has not provided a record to support his argument that the prosecutor committed misconduct by eliciting or failing to correct allegedly perjured testimony. Moreover, because Jackson's testimony was not directly contradicted by his police statement, defendant has also failed to carry "his burden of demonstrating that [the challenged] testimony was actually false . . . ." *Bass*, 317 Mich App at 274.

Next, defendant argues that the prosecutor committed misconduct by improperly asking about and commenting on defendant's decision not to tell the police where to find the gun after voluntarily turning himself in to police. Defendant contends that the prosecutor's statements improperly shifted the burden of proof and violated his right to remain silent. The prosecution is

---

[8] "Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013).

not permitted to "imply . . . that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). However, "[w]here a defendant . . . advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant." *People v Reid*, 233 Mich App 457, 478; 592 NW2d 767 (1999) (quotation marks and citation omitted). As to the argument relating to defendant's right to remain silent, this Court has stated:

> A defendant's right to due process guaranteed by the Fourteenth Amendment is violated where the prosecutor uses his postarrest, post-*Miranda*[9] warning silence for impeachment or as substantive evidence unless it is used to contradict the defendant's trial testimony that he made a statement, that he cooperated with police, or that trial was his first opportunity to explain his version of events. [*People v Solmonson*, 261 Mich App 657, 664; 683 NW2d 761 (2004), citing *Doyle v Ohio*, 426 US 610, 619 n 11; 96 S Ct 2240; 49 L Ed 2d 91 (1976).]

While cross-examining defendant, the prosecutor asked if defendant told the police where to find the gun when he turned himself in. Defense counsel objected, citing that the question violated defendant's right to remain silent. The trial court overruled the objection, and defendant simply stated that he did not tell the police where to find the gun. No further questions were asked about the issue until the jury was provided the opportunity to ask questions. One of those questions was why defendant did not tell the police where to find the gun. Defendant answered, "I was advised of my rights. My lawyer said to not . . . say anything." Then, during closing argument, the prosecutor stated the following to the jury:

> One of the instructions that the Judge is going to give you is Flight or Concealment. Now we know that the defendant ran away. He testified that he ran away because he panicked or he was, you know he said he, he panicked, but clearly if he thought Mr. Jackson was okay and nobody was shot and he wrestled the gun from Mr. Jackson. There wasn't no reason to panic. He wasn't in danger. He wasn't—Even if Mr. Jackson had gotten up, if the story that he said was true, he had the gun. Why did he run and dump the gun and then not tell the police where it was to corroborate his story? I mean he said he went and got a lawyer, so that's not stopping him from telling the police that he, where the gun is.

> And, and here's the thing. The defendant can sit there and not say a word, but if he's trying to proffer you or he wants you to believe some theory or some nonsense about his story. He does have a responsibility to bring forth some evidence that his story is true.

> The burden never shifts—

---

[9] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

It was at that point that defense counsel objected and the trial court sustained the objection. The prosecutor then completed that line of argument by stating that, "[Defendant] told you the story, and based on the facts and the evidence in this is it reasonable?"

The prosecutor's statement that defendant was responsible for offering evidence to support his version of events was improper because it implied "that the defendant must prove something or present a reasonable explanation for damaging evidence," which "tends to shift the burden of proof." *Fyda*, 288 Mich App at 463-464. However, the prejudicial effect was minimal considering that an objection was quickly made and sustained. The prosecutor's comment on the reasonableness of defendant's testimony was permissible and did not shift the burden of proof. See *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005) ("[A] attacking the credibility of a theory advanced by a defendant does not shift the burden of proof."). And the jury was instructed that defendant was presumed innocent unless the prosecutor carried its burden to prove guilt beyond a reasonable doubt. For these reasons, the prosecutor's improper comment did not deny defendant a fair trial.

As for defendant's argument that the prosecutor's question and comments improperly violated his right to remain silent, we addressed a similar issue in *Solmonson*, 261 Mich App 657. There, we explained that comments regarding a defendant's silence are constitutionally problematic only when "there is reason to conclude that his silence was attributable to the invocation of the defendant's Fifth Amendment privilege." *Id*. at 664-665. Because there was no specific evidence establishing whether the silence referenced by the prosecutor occurred before the defendant was advised of his *Miranda* rights or after he specifically invoked his right to remain silent, there was no constitutional error. *Id*.

For defendant, this case presents a similar problem. Although defendant stated that he was "advised of his rights" and was told by his lawyer not to tell police where the gun could be found, it is not clear whether those were *Miranda* rights told to defendant by police or whether he specifically told police that he wished to invoke his right to remain silent. Given the very limited testimony on the issue, it is only clear that defendant turned himself in and chose not to tell the police where to find the gun. Defendant presents no evidence regarding if or when he was informed of his *Miranda* rights, and he never stated that he specifically informed police that he was invoking his right to remain silent. Consequently, like the defendant in *Solmonson*, defendant in this case has failed to prove that the prosecutor was asking about or commenting on a constitutionally protected silence, which is the determinative fact for this issue.

## V. CUMULATIVE EFFECT OF ERRORS

Defendant lastly argues that even if one of the errors on its own did not warrant reversal, the cumulative effect of those errors do. We disagree.

"To warrant reversal based on cumulative error, 'the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial.' " *Schrauben*, 314 Mich App at 193, quoting *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). "In making this determination, only actual errors are aggregated to determine their cumulative effect." *Bahoda*, 448 Mich at 292 n 64. In other words, "[a]bsent the establishment

of errors, there can be no cumulative effect of errors meriting reversal." *People v Green*, 313 Mich App 526, 537; 884 NW2d 838 (2015) (quotation marks and citation omitted; alteration in original).

In the preceding analyses, we concluded that there were only two actual errors that occurred during trial, but that neither warranted reversal because they did not affect the outcome of the trial. Recall that the two errors were defense counsel's failure to impeach Jackson with his prior statement to police and the prosecutor's statement that implied defendant had the burden of proof to some extent. Defendant now contends that the combined effect of those two errors should require reversal.

As discussed earlier, the failure to impeach Jackson was not outcome determinative because (1) the police statement did not directly contradict Jackson's testimony, (2) Jackson did not tell the police that he was expecting defendant to be inside the home, and (3) unlike defendant's testimony, Jackson's version of events was corroborated by other evidence in the record. Further, the single misstatement by the prosecutor in closing argument did not substantially prejudice defendant given the sustained objection and the trial court's instruction that the prosecution bore the burden of proof. In sum, then, the cumulative effect of the two errors is little more than the effect each error had on the trial. Importantly, defendant was "entitled to a fair trial but not a perfect one for there are no perfect trials." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008) (quotation marks and citation omitted). Therefore, because there is nothing in the record to suggest that defendant's trial was unfair even considering the combined minor errors, he is not entitled to reversal for a new trial.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Douglas B. Shapiro