*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

TIMOTHY MICHAEL CROWLEY,

        Defendant-Appellee.

UNPUBLISHED
June 23, 2022

No. 356348
Washtenaw Circuit Court
LC No. 19-001134-AR

Before: GLEICHER, C.J., and SAWYER and GARRETT, JJ.

PER CURIAM.

In this interlocutory appeal, the prosecution appeals by leave granted[1] the circuit court's affirmance of the district court's decision to not bind over the charges against defendant. On appeal, the prosecution argues that the district court abused its discretion when it dismissed Counts 3, 4, 7, and 8 because it presented sufficient evidence that defendant coerced the complainant into sexual acts and that the complainant suffered personal injury. For the reasons discussed in this opinion, we reverse, remand, and direct the trial court to reinstate Counts 3, 4, 7, and 8.

## I. BACKGROUND

This is a case of alleged criminal sexual conduct involving a Catholic priest. Whether defendant sexually abused the complainant is not generally disputed. However, defendant successfully disputed in the courts below whether the prosecution elicited evidence that defendant used force or coercion to abuse the complainant at any time not barred by the applicable statute of limitations.

In May 2019, the Department of Attorney General charged defendant with eight counts: four counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b; and four counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c. According to the complaint, the

---

[1] See *People v Crowley*, unpublished order of the Court of Appeals, entered May 17, 2021 (Docket No. 356348).

-1-

alleged acts occurred between or about June 24, 1986 and December 31, 1990. Each count included the phrases "with a 14-16 year old child" and reflects that the "victim was at least 13 but less than 16 years of age." Counts 3, 4, 7, and 8 (the counts the prosecution seeks to resurrect on appeal) relied on a theory that defendant effected sexual contact or penetration through force or coercion and that the complainant sustained personal injury. For example, Count 3 reflected as follows:

> CRIMINAL SEXUAL CONDUCT—FIRST DEGREE (Multiple Variables)
>
> did engage in sexual penetration, to-wit: Fellatio, with a 14-16 year old child, under the following circumstance(s), defendant effected sexual penetration through force or coercion and the victim sustained personal injury; contrary to MCL 750.520b. [750.5208.]

The relevant evidence in this case was introduced at the preliminary examination. Special Agent David Dwyre of the Department of Attorney General testified that, in October 2018, he obtained a search warrant for documents involving clergy abuse at all seven diocese of the Catholic Church in Michigan, including the Diocese of Lansing, which oversees the parishes relevant to this case. Included in the subsequently seized documents was information about defendant and the complainant. Dwyre testified that the documents revealed that defendant was appointed to St. Anthony Parish in Hillsdale, Michigan, in 1984. He was later appointed to the St. Thomas Parish in Ann Arbor, Michigan, in 1985. He was later appointed to a parish in Anchorage, Alaska, and left Michigan in August 1995. Defendant did not reside in Michigan again until he was arrested and brought back to the state in 2019.

The complainant testified that he was born in November 1972. The complainant began by describing defendant as a former "priest for the Catholic Church" and "a former friend of the family." The complainant testified that he met defendant when he was "right around the age of 10," when he was an altar boy at St. Mary Star of the Sea Parish in Jackson, Michigan. At that time, in 1982, the complainant and his family were practicing Catholics. Defendant was his priest. The complainant testified that, when he was a child, his family (himself, his father, mother, and sister) attended St. Mary. He went to school there. After attending St. Mary's school through sixth grade, the complainant attended Jackson Catholic Middle School for two school years before attending Jackson Lumen Christi High School for ninth and part of tenth grade, before graduating from Jackson High School.

The complainant elaborated on defendant being a "family friend," explaining as follows:

> He was a priest at the church. And, um, we celebrated religiously, um, through the church. And bonded with, um, [defendant]. And expanded the communication, to the point, where he was a family friend. And would come over for dinners. And, um, other events, not related with the church.

The complainant testified that he spent time alone with defendant. His mother encouraged him to do so. Asked how he came to spend time alone with defendant, the complainant testified as follows:

Uh, I was asked if I wanted to come over to the rectory, uh, Saint Mary's Parish, um, on several different occasions. And, um, my mother thought that was a great idea. [Defendant] was a great mentor, keepin' me out of harm's way. Um, he [sic?] was confident that, uh, he was a solid person. And, uh, thought it would, uh, guide me in the right path, possibly down a missionary position.

The complainant testified that defendant abused him at the rectory: "Early on, um, it was more of a, um, simple touch to the shoulder." Defendant would tell the complainant, "You're a good boy." "[O]cassionally," defendant "would touch [the complainant's] butt." Defendant "encouraged [the complainant] to sleep in the same bed with him." Defendant would tell the complainant: "It's normal. It's natural." He would tell the complainant that he could "sleep with [his] underwear on." The complainant testified that, at the time, he "thought it was normal," and he "thought that was, basically, what priests do to bond with people." He had been raised with the idea that priests were to be respected and that priesthood "was the highest form of respect in the Catholic Church." He was 10 years old at the time. In bed, defendant would conduct "simple touches" of the complainant's leg. The complainant testified that defendant would "touch my penis over the top of my underwear." The complainant thought this "was weird." "But," he said, "it was more cuddling." Defendant told him "it was a bonding thing," that "it was normal," and that "[i]t was natural." The complainant testified that defendant would press his penis against him, over the top of the complainant's underwear. Once, the complainant was not wearing underwear and defendant "didn't insert his penis . . . but pressed his penis up against [the complainant's] anus. It was probably a fingertip." The complainant testified that these things occurred at St. Mary two to three times.

The complainant testified that defendant was eventually reassigned to St. Anthony Parish in Hillsdale. His family continued to attend St. Mary. But the complainant's mother would drive him "to the Hillsdale parish to spend time with" defendant. The complainant was about 13 years old. The complainant's mother drove him to see defendant alone at the Hillsdale location "dozens" of times. During these visits, defendant began serving the complainant alcohol and cigarettes. The complainant testified that, after defendant provided him with the alcohol and cigarettes, defendant would provide pornographic materials and pornographic videos that included multiple men. While the pornographic videos played, defendant would change into his "short shorts," with no underwear. Defendant "would massage his penis" so that the complainant could see his erection and would tell the complainant it was "natural" if he "got hard," too. After the video, defendant would encourage the complainant to sleep in the same bed as him. Defendant would masturbate himself or the complainant. Sometimes, defendant performed oral sex on the complainant, or the complainant performed oral sex on defendant. The complainant did not know what a "blowjob" was at the time. Defendant would "snuggle" the complainant and place his erect penis between the complainant's butt cheeks, and vice versa.

The complainant testified that a man, JC, who was defendant's friend and a youth minister affiliated with the church in Hillsdale, was invited to defendant's residence at the rectory one night. The invitation came after, during a viewing of a pornographic movie, defendant asked the complainant if he would be interested in another man licking his anus. Defendant told the complainant that he had a friend who would be willing to do that to him. The complainant testified that JC visited the rectory with him "around one of [the complainant's] birthdays when he was "[s]eventeen, eighteen, maybe." That day, defendant and JC "wrestled" the complainant "to the

ground." They "playfully" removed the complainant's underwear. They engaged in dirty talk, calling the complainant a "bad boy" and giving him "birthday spankings." Defendant held the complainant down, and JC licked the complainant's anus. The complainant defecated all over JC's face, ran, and hid in the closet. The next morning, defendant and JC told the complainant that "everything was gonna be okay."

The complainant testified that, at some point, defendant was reassigned to a parish in Ann Arbor. He testified that the same types of activities that occurred at the Hillsdale rectory occurred at the Ann Arbor rectory: sleeping naked together, snuggling, and fellatio. Once, the complainant thought he urinated in defendant's mouth while defendant was performing oral sex on him. The complainant testified that the abuse continued until he was over 18 years old.

On cross-examination, the defense attempted to impeach the complainant in regard to when the abuse ended. At one point, the complainant agreed that he had told Special Agent Dwyre that the abuse ended "right around the time [he] got [his] driver's license," at 16 years old. The complainant agreed that he turned 16 years old in November 1988. Defense counsel asked if it was accurate that, in 1993, during a meeting in regard to a civil settlement, the complainant reported that the abuse started approximately when he was eight years old and ended when he was between 15 and 16 years old. The complainant responded that, "Everything is approximate, yes." The complainant stated that, after he transferred out of Lumen Christi High School, he met with, and had sexual contact with, defendant at defendant's residence in Michigan Center, Michigan. He was over 16 years old at the time. He agreed that no one used physical force to accomplish a sexual contact. He agreed that no threats were made to him after he turned 16 years old. But he testified that he spent the night with defendant in Ann Arbor. He testified that, although he was driving age at the time, his mother drove him there or defendant would pick him up in his car. He did not recall ever driving himself to Ann Arbor.

The complainant testified that, in 1993, he became suicidal. He got drunk, and he tried to intentionally drive his father's truck over 100 miles an hour into a tree in an attempt to end his life. But at some point, he swerved back onto the road and stopped. After crying, he drove to the home of his father's best friend. The complainant's father always told him that, if he "ever had a problem that was too large to handle," he "could go to his best friend, without judgment, consequences, and we would sort it out." The complainant told his father's best friend about defendant. His father's best friend told the complainant that it would be okay, he took the complainant home, and they met with the complainant's parents. The complainant's father made statements about ending defendant's life, and the complainant became "scared" for defendant.

On redirect examination, the complainant clarified that the abuse ended just before he signed an affidavit in August 1993, or a "short time" before he went to see his father's best friend. He testified that he never felt that he had a choice whether to engage in the sexual activities with defendant, even after he turned 16 years old. Explaining why, he testified as follows:

It felt natural, at that point. It—it felt that is expected. It was—I almost felt guilty not hangin' out with my mentor and fulfilling my parent's dreams. And it just didn't—I didn't want to live anymore.

The district court asked more clarifying questions about when the sexual contact ended, noting that the complainant obtained his driver's license four years before he signed the 1993 affidavit. The complainant testified that he remembered driving to see defendant in Michigan Center after he obtained his driver's license. And defendant still drove to him. But he "couldn't tell" the district court "how many *weeks* before the document was signed" that the contact stopped. (Emphasis added). Asked if he meant to say "weeks," the complainant responded affirmatively. Several times on cross-examination, the complainant stated that the abuse ended after he obtained his driver's license.

In regard to whether defendant ever threatened the complainant, the following exchange occurred:

> [*Prosecutor*]: Um, had the defendant ever said to you anything about whether or not you should tell anybody about what had been going on between the two of you?

> [*The complainant*]: Yes.

> [*Prosecutor*]: What did he say?

> [*The complainant*]: Told me if I ever told the nuns, or my parents, he would kill me.

The complainant testified that defendant made this statement to him in Hillsdale. The complainant and defendant could hear that a nun "was coming up the stairwell." Defendant "ran down the stairs and had stopped her." The complainant later clarified that he took defendant's words as "an ongoing threat."

In 1993, the complainant's family reached a civil settlement with the Diocese of Lansing. The settlement included a nondisclosure agreement. At the preliminary examination, the complainant testified that, at the time, he thought the nondisclosure agreement prevented him from talking to the police.

The district court denied bindover and dismissed all charges. Announcing its ruling, the district court stated:

> Um, I think we all agree on the facts of this case. And we all agree on the facts that, uh, the behavior alleged is abhorrent, abominable, horrible, damnable. Uh, however, the law is the law.

> Um, the Court finds that the criminal sexual conduct, that was occurring on a continual basis, from the time the witness was 10 years-old until he turned 16, or the day before his—his (indiscernible) birthday. The last of those acts occurred on a date that is outside of the statute of limitations, in this case. And, for that reason, this case must be dismissed.

The circuit court affirmed. Having granted leave, we now consider the prosecution's interlocutory appeal.

## II. ANALYSIS

On appeal, the prosecution argues that the district court's ruling was an abuse of discretion. It does not appeal the ruling as applied to Counts 1, 2, 5, and 6; it only seeks reinstatement of Counts 3, 4, 7, and 8. Among these were two counts of CSC-I under MCL 750.520b(1)(f) and two counts of CSC-II under MCL 750.520c(1)(f).

This Court reviews a district court's bindover decision for an abuse of discretion. *People v Fairey*, 325 Mich App 645, 649; 928 NW2d 705 (2018). An abuse of discretion occurs when the district court's decision falls outside the range of principled outcomes. *Id*.

In *Fairey*, this Court explained:

> At a preliminary examination, the prosecution must present evidence establishing that the defendant committed the charged offense, and the district court must find that probable cause exists to bind over a defendant for trial. To satisfy this burden, the prosecution must present evidence of each and every element of the charged offense, or enough evidence from which an element may be inferred. [*Id*. at 648-649 (citations omitted).]

In regard to the probable cause standard,

> Probable cause is established if the evidence would persuade a careful and reasonable person to believe in the defendant's guilt. Evidence supporting that the defendant perpetrated the crime may be circumstantial, but must nevertheless demonstrate reasonable grounds to suspect the defendant's personal guilt. The evidence considered must be legally admissible. [*Id*. at 649 (citations omitted).]

Our Supreme Court has explained that "a magistrate may not decline to bind over a defendant where there is a conflict of evidence, or where there is a reasonable doubt as to his guilt; all such questions should be left for the jury upon the trial." *People v Anderson*, 501 Mich 175, 185; 912 NW2d 503 (2018) (quotation marks and citation omitted).

Before diving into the testimony, there are two preliminary issues that appear to warrant discussion. The first is the statute of limitations. Under MCL 767.24, as amended by 1987 PA 255, charges for CSC offenses had to be filed "6 years after the commission of the offense or by the alleged victim's twenty-first birthday, whichever is later." The complainant testified that defendant's conduct continued until "weeks" before the civil settlement was reached, in August 1993. The complainant turned 21 years old in November 1993. Accordingly, the statutory period of limitations began running after the commission of the last criminal act and would ordinarily have ran for six years, until, possibly, sometime in summer 1999.

But the period of limitations tolled from the date that defendant left Michigan for his appointment in Alaska. The evidence reflected that defendant left for Anchorage, Alaska, in August 1995. Any unexpired period of limitations tolled from that date. *People v Kasben*, 324 Mich App 1, 9; 919 NW2d 463 (2018); see MCL 767.24(11). Combining defendant's departure from Michigan with the complainant's testimony that the sexual acts occurred until "weeks" before

settlement was reached in August 1993, the evidence reflects a possibility that the last criminal acts occurred about two years before defendant left Michigan. Defendant only returned to Michigan after Special Agent Dwyre arrested him in Arizona. Therefore, the prosecution presented at least some evidence that the acts forming the appealed counts occurred within the statute of limitations period.

In regard to evidentiary issues, we note that the district court properly considered potential other-acts evidence. See MRE 404(b); see also MCL 768.27b.

Now we turn to whether the prosecution presented enough evidence to support binding over Counts 3, 4, 7, and 8. We conclude that it did.

Under MCL 750.520b(1)(f), a person is guilty of CSC-I when:

The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration. Force or coercion includes, but is not limited to, any of the following circumstances:

(*i*) When the actor overcomes the victim through the actual application of physical force or physical violence.

(*ii*) When the actor coerces the victim to submit by threatening to use force or violence on the victim, and the victim believes that the actor has the present ability to execute these threats.

(*iii*) When the actor coerces the victim to submit by threatening to retaliate in the future against the victim, or any other person, and the victim believes that the actor has the ability to execute this threat. As used in this subdivision, "to retaliate" includes threats of physical punishment, kidnapping, or extortion.

(*iv*) When the actor engages in the medical treatment or examination of the victim in a manner or for purposes that are medically recognized as unethical or unacceptable.

(*v*) When the actor, through concealment or by the element of surprise, is able to overcome the victim.

Similarly, under MCL 750.520c(1)(f), a person is guilty of CSC-II when "[t]he actor causes personal injury to the victim and force or coercion is used to accomplish the sexual contact." "Force or coercion" is defined identically in both statutes. See MCL 750.520c(1)(f). "Personal injury" includes "mental anguish." MCL 750.520a(n).

As the CSC statutes indicate, the enumerated list of conduct constituting force or coercion is not exhaustive. See MCL 750.520b(1)(f); MCL 750.520c(1)(f). In *People v Green*, 313 Mich App 526, 539; 884 NW2d 838 (2015), this Court explained:

The statutes expressly provide that the list of circumstances in which force or coercion may be proved is not exhaustive. In *People v Premo*, 213 Mich App

-7-

406, 410; 540 NW2d 715 (1996), a panel of this Court explained that "the Legislature did not limit the definition of force or coercion to the enumerated examples in the statute. Furthermore, the existence of force or coercion is to be determined in light of all the circumstances and is not limited to acts of physical violence." (Citations omitted.) "Coercion," the Court noted, " 'may be actual, direct, or positive, as where physical force is used to compel act against one's will, or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse.' " *Id*. at 410-411, quoting *Black's Law Dictionary* (5th ed). Further, " 'force or coercion' exists whenever a defendant's conduct induces a victim to reasonably believe that the victim has no practical choice because of a history of child sexual abuse or for some other similarly valid reason." *People v Eisen*, 296 Mich App 326, 335; 820 NW2d 229 (2012).

Our state's courts have explored the idea of "constructive coercion" in several cases. In *Premo*, 213 Mich App at 407,

> The charges arose out of three separate incidents involving three different women. At the time of the incidents, defendant was a teacher at Ferndale High School, and the victims were students. The victims testified at the preliminary examination that defendant pinched their buttocks while they were on the premises of Ferndale High School. Defendant contends that pinching the victims' buttocks is insufficient to satisfy the requirement that force or coercion be used to accomplish sexual contact, MCL 750.520e(1)(a), and that the circuit court therefore erred in denying his motion to quash the charges. [Citation omitted.]

This Court denied the motion to quash, explaining in relevant part as follows:

> Defendant's conduct was not included in the enumerated examples of coercion in MCL 750.520b(1)(f)(i)-(iv). However, the Legislature did not limit the definition of force or coercion to the enumerated examples in the statute. MCL 750.520e(1)(a). Furthermore, the existence of force or coercion is to be determined in light of all the circumstances and is not limited to acts of physical violence. *People v Malkowski*, 198 Mich App 610, 613; 499 NW2d 450 (1993). Coercion
>
> > may be actual, direct, or positive, as where physical force is used to compel act against one's will, or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse. [Black's Law Dictionary (5th ed), 234.]
>
> We believe that defendant's actions constituted implied, legal, or constructive coercion because, as a teacher, defendant was in a position of authority over the student victims and the incidents occurred on school property. Defendant's conduct was unprofessional, irresponsible, and an abuse of his authority as a teacher. Accordingly, we conclude that defendant's conduct in this case is

sufficient to constitute coercion under MCL 750.520e(1)(a). [*Premo*, 213 Mich App at 410-411 (citations omitted).]

In *People v Reid*, 233 Mich App 457, 470; 592 NW2d 767 (1999), this Court upheld a defendant's CSC-I convictions under a theory of constructive coercion in a sufficiency of the evidence challenge when the defendant manipulated a series of events that began with him establishing a kind of counselor-patient relationship with the victim. This Court explained as follows:

> Viewing the evidence in the light most favorable to the prosecution, defendant placed himself, with regard to the complainant, in a role highly analogous for present purposes to that of a psychotherapist with a patient. Defendant indicated to the complainant's father and the complainant that he had acted in a counseling role at a church and talked with the complainant about problems that he was having. Having established a position of trust with the complainant's parents, defendant invited the complainant to spend the night at the house of defendant's parents. Indeed, the complainant's testimony that defendant asked him to come over to play on a computer could reasonably have been taken by the complainant and his parents as part of an effort by defendant as an unofficial "counselor" to continue developing a rapport with the complainant. A reasonable jury could infer from this evidence that defendant manipulated his "counseling" role with the complainant—"a position of authority"—in order to have the complainant alone where defendant could sexually assault him.

> According to the complainant, on the night of the incidents, defendant, while acting in this position of authority over the complainant, gave the complainant beverages that he "spiked" with alcohol and had the complainant consume these beverages to the point of becoming heavily intoxicated. A reasonable jury could infer that this was done with the intent to reduce the complainant's inclination or ability to resist engaging in sexual activity with defendant. The complainant's testimony strongly reflects that he was disoriented at the time of the acts of fellatio and that he was, in large part, mechanically following the commands of defendant with regard to his actions or lack of resistance. He described himself as feeling as if he were in a "bad dream" during the encounter. Viewing the evidence most favorably to the prosecution in light of all the circumstances, [*People v Medlyn*, 215 Mich App 338, 340; 544 NW2d 759 (1996)], defendant used a position of authority over the complainant to engineer a quite elaborate series of events to place the complainant in a confused and disoriented condition and then took advantage of the complainant's condition to perform fellatio on the complainant and to instruct successfully the complainant to perform fellatio on him. This is sufficient evidence for a rational factfinder to conclude that the complainant was "constrained by subjugation," *Premo*, [213 Mich App] at 411, and, thus, coerced into submitting to these acts of sexual penetration by defendant through use of his position of authority over the complainant. [*Reid*, 233 Mich App at 470-471.]

In *People v Green*, 313 Mich App 526, 539-541; 884 NW2d 838 (2015), this Court upheld a defendant's convictions of CSC-III and CSC-IV under a coercion theory when the defendant used his authority as a Children's Protective Services worker overseeing the victim's case to accomplish sexual contact with the victim. In regard to one of the victims in that case, this Court stated:

> Like the defendants in *Premo* and [*People v*] *Knapp*[, 244 Mich App 361; 624 NW2d 227 (2001)], defendant was in a position of authority over the complainants because he was the CPS worker assigned to investigate the abuse or neglect complaints filed against them individually. Testimony established that CPS has the authority to provide services to rectify the risk to a child and petition the court for removal of a child or termination of parental rights. CPS may also petition to have a child removed from a home if a mother fails to protect her child from an abusive father or boyfriend, which was the situation that caused the complaint to be filed in JG's case. Fear of losing one's child through neglect or abuse proceedings would produce an extreme reaction in most parents. As such, the complainants were "'in a position of special vulnerability with respect to the defendant[]'." *Knapp*, 244 Mich App at 371 (citation omitted). Moreover, in light of all the circumstances, defendant's actions as a CPS worker, like those of the teacher in *Premo*, were "unprofessional, irresponsible, and an abuse of authority . . . ." *Premo*, 213 Mich App at 411.
>
> With respect to JG, the testimony established that defendant informed her on the first day that if she did not leave her fiancé, her child would be taken away. Defendant rubbed her shoulders and then performed a full body massage that included her groin area. Although defendant asked her if she wanted him to still operate on a professional level and that it was up to her, he continued the massage, pulled up her sports bra, pulled her shorts down, and digitally penetrated her. JG testified that she knew he would not stop until he got what he wanted. They then performed oral sex on each other and had intercourse. In light of all the circumstances, *Premo*, 213 Mich App at 409-411, the evidence established that defendant used his position of authority to manipulate and coerce JG to perform the sexual acts with him. [*Green*, 313 Mich App at 539-541 (second and third alterations in original).]

In *People v Bayer*, 279 Mich App 49, 66; 756 NW2d 242 (2008), vacated on other grounds 482 Mich 1000 (2008), this Court upheld a defendant's CSC convictions under a coercion theory, even though the sexual acts occurred while the victim was an adult and the victim admitted to being attracted to the defendant. The defendant was the adult victim's psychiatrist. *Id*. at 51. During treatment sessions, the defendant made sexual advances and eventually engaged in a sexual relationship with the victim. *Id*. at 52-53. The defendant and the victim engaged in this relationship in the defendant's office and in various motels. *Id*. at 52-54. Additionally,

> According to the victim, defendant advised her not to confess her relationship with him to her husband or to reveal the types and amounts of medication she was prescribed. The victim acknowledged that she had feelings for defendant, but opined that her sexual encounters with him were attributable to her

highly medicated condition. The victim informed defendant that she had developed suicidal ideation but asserted that defendant discouraged her from seeking hospitalization and from consulting other professionals for treatment. The victim reported that defendant offered her $50,000 to not reveal their relationship to anyone. The victim finally terminated her contacts with defendant following her attempted suicide. [*Id*. at 54-55.]

On appeal, the defendant argued, in part, that the victim consented to the sexual relationship. *Id*. at 63-64. This Court rejected this argument, explaining that:

> Although defendant denies the use of any medical pretext for the sexual encounters, a factual issue exists. While the victim acknowledged having "feelings" for and a sexual attraction to the defendant, this is not dispositive of whether defendant victimized her. The victim's voluntary participation in this relationship is called into question by the inherent inequality and potential for exploitation within the doctor-patient relationship. The medical profession's code of ethics expressly provides that sexual contact between a doctor and a patient is absolutely inappropriate, unethical, and unacceptable under any set of facts or circumstances. In addition, this victim's ability to either consent or voluntarily participate in this relationship is questionable because of her history of mental-health issues and susceptibility to manipulation through defendant's prescription of multiple medications. Defendant was well aware of the victim's condition given his prolonged history of involvement as her therapist. As such, defendant's actions are particularly egregious. [*Id*. at 66-67.]

Further rejecting the defendant's argument in regard to consent and force or coercion, this Court explained:

> Contrary to defendant's argument, the presence of consent is not necessarily the factual equivalent of the absence of coercion. Rather, it is a determination of the validity of that consent that is the focus of the inquiry. The fact that a victim "consented" to the touching, or even voluntarily pursued an intimate relationship with the therapist, is only of significance if it can also be shown that there exists no inference or demonstration of impermissible manipulation by the medical professional of his or her patient to secure the sexual contact. [*Id*. at 68.]

In *People v Regts*, 219 Mich App 294, 296; 555 NW2d 896 (1996), this Court affirmed a circuit court's reinstatement of charges following a district court's denial of bindover when the

> defendant, as the victim's psychotherapist, manipulated therapy sessions to establish a relationship that would permit his sexual advances to be accepted without protest. That is, he subjugated the victim into submitting to his sexual advances against her free will. Accordingly, the circuit court properly reinstated charges with respect to all "coercion" theories.

The prosecution also cites *Knapp*, 244 Mich App at 372, for the proposition that "the characteristic dominant and subordinate roles in any teacher-student relationship places the student

in a position of special vulnerability." Upholding the defendant's conviction, the *Knapp* Court explained the proposition this way:

> We find the circumstances of this case particularly illustrative of this point. The complainant was the only young adolescent in a class taught and attended by adults. Given his age, the unconventional nature of the "curriculum," and the trust defendant fostered with the complainant's mother, the complainant was highly susceptible to abuse. Under these circumstances, we find that defendant exploited and abused his position of authority to compel an extremely vulnerable youth to engage in sexual contact. This clearly constitutes coercion for purposes of this section of the CSC II statute. [*Id*.]

In this case, we conclude that the prosecution presented sufficient evidence at the preliminary examination to support bindover of the four appealed charges against defendant. See *Fairey*, 325 Mich App at 649. The relevant statutes and our state's caselaw support the prosecution's theory of constructive coercion. As this Court has recognized, the CSC statutes' definition of what constitutes force or coercion are not exhaustive by their own terms. *Greene*, 313 Mich App at 539. All the facts and circumstances can be considered when determining whether sexual conduct was coerced. *Id*. In other words, our state's caselaw makes it clear that coercion can manifest in ways unique to the relationship between a defendant and a victim, and in ways unique to how that relationship developed.

The record reflects the following testimony in support of the charges. The relationship between the complainant and defendant began when the former was 10 years old. Defendant was the complainant's priest. The complainant and his family were practicing Catholics. The complainant's mother encouraged him to seek mentorship from defendant in hopes that he would become a priest himself. The complainant testified that he was raised to believe that Catholic priests deserved the utmost respect. The complainant testified that defendant began with small acts and over time began the sexual acts with him. The complainant testified that defendant told him that everything that was happening was normal and natural, and that everything would be okay. The complainant testified that defendant gave him alcohol and cigarettes before performing sexual acts with him.

Although the record is undisputed that defendant ceased to be the complainant's priest when the complainant was about 12 years old and that the statute of limitations barred any acts that occurred at that time, the complainant testified that the mentoring relationship continued. The complainant's mother continued to encourage the relationship, including by driving him to defendant's residences in Hillsdale, Ann Arbor, and Michigan Center. The record was also undisputed that, although defendant was no longer the complainant's priest, he was still a priest, and still owed the "highest form of respect," as the complainant called it. The complainant testified that, by the time defendant was assigned to the parish in Ann Arbor, the complainant believed that their relationship and the sexual acts committed between them were normal. The complainant testified that he felt that had he no choice but to submit to defendant's sexual acts or requests. He testified that he continued to feel "guilty" when he declined to spend time with his mentor.

The complainant also testified that, when defendant was still assigned to Hillsdale (during a time still barred by the statute of limitations), defendant threatened him by stating that he would

kill the complainant if he ever told the nuns or his family about defendant's conduct. The complainant testified that he considered the threat to be "ongoing." But admittedly, defendant's argument that there is no evidence that this threat was used to *accomplish* a sexual act, as the statutes require, see, e.g., MCL 750.520b(1)(f), is at least correct when the comment is construed narrowly.

Regardless, we rely on, as past panels have done, the totality of the circumstances surrounding the complainant and defendant's relationship. See, e.g., *Premo*, 213 Mich App at 410-411. In the end, at this stage, this case may be as simple as this: the complainant's testimony established probable cause that defendant's position and the complainant's upbringing created a power imbalance that defendant manipulated in order to subdue—or coerce—the complainant into sexual acts. See *Bayer*, 279 Mich App at 66-67.

The record also contained evidence of personal injury in the form of mental anguish. The complainant testified that he attempted suicide or came close to doing so when he began driving his father's truck at 100 miles an hour toward a tree but swerved back onto the road at the last second. The complainant testified that his relationship with defendant also led to his questioning his sexual orientation.

In contrast, defendant primarily relies on our Supreme Court's unanimous decision in *People v Perkins*, 468 Mich 448; 662 NW2d 727 (2003), arguing that it is "particularly relevant" given a "striking similarity to the present case." At issue in *Perkins* was whether the prosecution presented enough evidence to secure a bindover on several charges, one being CSC-I. *Id*. at 449. The defendant, Perkins, was a Bay County deputy sheriff. *Id*. at 450. The victim was a 16-year-old girl. *Id*. The victim "was a close friend of [Perkins's] family." *Id*.

> At the time of the charged incident, the complainant had known defendant and his family for approximately four years. Defendant's wife had been the complainant's basketball coach and defendant often had assisted his wife when the team practiced. From the date that the complainant met defendant until the incident involved here, the complainant regularly babysat for defendant's children, attended church with the family, and, for a time, resided with them. During that period, the complainant and defendant began having sexual relations.

> On the date of the charged incident, the complainant was living with her mother and had just returned from a month-long excursion in Mexico. While the complainant was in Mexico, defendant telephoned her twice. During one call, defendant told the complainant that he had left a present for her under her mother's porch.

> The complainant returned from Mexico and discovered that defendant had placed a ring under the porch. She then called defendant and left a voice mail message for him. They agreed to meet on the following Sunday in an industrial park while the complainant was on her way to church.

> On Sunday, the complainant drove to the industrial park, found defendant, who was on duty in a marked police cruiser, and got into the car with him. The

-13-

complainant and defendant hugged and talked about her trip to Mexico.  Finally, the complainant fellated defendant.  [*Id*. at 450-451.]

The prosecution charged Perkins with, among other things, CSC-I.  *Id*. at 451.  But the district court dismissed this charge following the preliminary examination.  *Id*.

Defendant emphasizes the prosecution's theory in that case:

At the preliminary examination, the prosecutor's theory was that defendant was guilty of CSC-I through coercion.  As an authority figure, defendant had engaged the complainant in continuing sexual conduct beginning when she was much younger.  The prosecutor reasoned that defendant thus established a pattern of abuse that eroded the complainant's ability to resist his sexual advances during the incident in question.  The prosecutor presented evidence that a child can be psychologically subjugated in this manner.  [*Id*. at 454.]

On appeal, this Court reversed and reinstated the charge.  *Id*. at 455.  But our Supreme Court disagreed.  *Id*.  It reasoned as follows:

There was no testimony that the complainant had been so subjugated.

In any event, the record shows that no evidence was presented at the preliminary hearing to support the prosecutor's assertion that the complainant was coerced, in any sense of that term, to fellate defendant on the occasion in question.

The facts were that the complainant had been out of the country for a month before the charged conduct occurred.  The complainant initiated the meeting.  Moreover, the sexual relationship between defendant and the complainant continued beyond the date of the charged conduct and lasted until the complainant entered into a relationship with her husband.

The unrebutted preliminary examination facts indicate that, on the date of the incident in question, the relationship was consensual and the complainant was involved in it of her own volition.  If it were true that the complainant's actions were the result of defendant's subjugation of her will, then or at an earlier date, the prosecutor failed to present evidence of it.  Because of the lack of evidence, it is unnecessary for this Court to reach the question whether psychological subjugation is a viable theory on which to rest a charge of CSC-I.  [*Id*. at 454-455.]

We are not persuaded by defendant's analogy to *Perkins*.  There is no discussion in *Perkins* that the defendant used his position as a police officer to build a relationship with the complainant.  Their relationship came about after the complainant became a friend of Perkins's family.  There was no allegation that Perkins wielded his office and authority to subdue or manipulate the complainant.  There was no allegation that the complainant's family encouraged her to build a mentor-mentee relationship with Perkins or that her family had any special reverence for police officers.  In other words, Perkins's status as an authority figure appears to have been rather incidental to that case.

The *Perkins* Court also found instructive that the complainant initiated the meeting that gave rise to the charges after a month away from Perkins and that the ongoing sexual relationship between Perkins and the complainant ended when the complainant began a relationship with her husband. In contrast, there is no evidence in this case that the complainant ever initiated contact with defendant. At most, there is evidence that the complainant drove himself to defendant's residence after obtaining his driver's license. But again, the complainant's family continuously encouraged the relationship. There is no evidence that a significant break occurred in the relationship, although the relevance of that may be minimal when the complainant testified that the relationship was ongoing for many years. Short breaks in the relationships, therefore, may not be relevant. The complainant's testimony about his attempted or near-attempted suicide is also distinguishable, possibly demonstrating that the complainant wanted out of the relationship with defendant but did not know how, unlike the complainant in *Perkins*, who again, initiated the meeting during which the alleged sexual assault occurred and ended the relationship when she entered a new relationship.

Defendant correctly notes that some cases discussing positions of authority and coercion arose under MCL 750.520b(1)(b)(*iii*) and MCL 750.520c(1)(b)(*iii*), which are applicable when the victim "is at least 13 but less than 16 years of age" and the "actor is in a position of authority over the victim and used this authority to coerce the victim to submit." That said, this Court has cited cases crossing the different CSC subsections when determining what constitutes coercion, finding cases involving different subsections "highly instructive." *Reid*, 233 Mich App at 469.

Reversed and remanded for proceedings consistent with this opinion. Counts 3, 4, 7, and 8 are reinstated. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Kristina Robinson Garrett

-15-